1

2

3

4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7    FATEHY ABDO ALI MOHAMED,              Case No.  19-cv-05558-JCS

             Plaintiff,
8
                                          **ORDER GRANTING MOTION TO**
         v.
9                                          **DISMISS**

10   DONALD TRUMP, et al.,                 Re: Dkt. No. 98

             Defendants.
11

12

## I.    INTRODUCTION

    The original plaintiffs in this case are thirteen United States citizens or lawful permanent

residents of Yemeni descent who filed I-130 petitions on behalf of family members who sought

visas permitting them to come to the United States and reside here permanently.  Two of the

plaintiffs resided in this district when the action was initiated.  All of the plaintiffs alleged that

they had filed I-130 petitions and their beneficiaries had been interviewed by State Department

consular officers at the United States' Embassy in Djibouti between April and December of 2017.

According to Plaintiffs, although all of their beneficiaries' visas were approved at the interviews,

the visas were never issued.  Instead, the beneficiaries were later told that their visas had been

denied pursuant to Presidential Proclamation 9645 ("Proclamation"), prohibiting nationals from

certain countries, including Yemen, from entering the United States.  Plaintiffs brought this action

in September 2019 seeking to compel Defendants to issue the visas, asserting that the

Proclamation expressly excluded visas that had already been approved at the time of the

Proclamation.

    In the intervening years since this action was filed, the Proclamation has been revoked

and the claims of all of the original plaintiffs except Abdo Ali Mohamed have been dismissed.

United States District Court
Northern District of California

1  Abdo Ali Mohamed himself passed away during the pendency of this action and, by stipulation of

2  the parties, Fatehy Abdo Ali Mohamed has been substituted as the petitioner of record on the

3  relevant I-130 petition.  Dkt. no. 96, Joint Stipulation at 1 n.2.[1]  Four of Abdo Ali Mohamed's

4  family members have been issued visas since this case was initiated, but three of his family

5  members – Mayada Abdo Ali Mohamed, Lamia Abdo Ali Mohamed, and Emad Abdo Ali

6  Mohamed (the "Remaining Beneficiaries") – have not been issued visas and the claims related to

7  those beneficiaries remain pending.

8          Presently before the Court is Defendants' Motion to Dismiss ("Motion").  The Court held a

9  hearing on the Motion and following the hearing, the parties submitted supplemental briefing

10  addressing the availability of equitable relief. For the reasons stated below, the Motion is

11  GRANTED.[2]

## II.      BACKGROUND

### A.    The Visa Application Process

14          In order for U.S. citizens or lawful permanent residents to obtain a visa for a family

15  member to immigrate to the United States, they must file an I-130 Petition for Alien Relative with

16  the U.S. Citizenship and Immigration Services ("USCIS") in which the petitioner must establish

17  that the beneficiary has a qualifying family relationship. *See* 8 U.S.C. § 1151(b)(2)(A)(i); 8 U.S.C.

18  § 1153(a)(2). USCIS's approval of an I-130 petition means that, as of the date of approval of the I-

19  130 petition, the petitioner has met their initial burden of establishing that the beneficiary has the

20  requisite relationship with the petitioner. *Tongatapu Woodcraft Hawaii, Ltd. v. Feldman*, 736 F.2d

21  1305, 1308 (9th Cir. 1984).

22          If USCIS approves an I-130 petition, the noncitizen beneficiary then applies to the U.S.

23  Department of State ("DOS") for a visa. 8 U.S.C. § 1181(a); 22 C.F.R. § 42.63(a)(1). To obtain a

[1] In this Order, references to "Plaintiff" in the singular refer to Abdo Ali Mohamed or Fatehy
Abdo Ali Mohamed, depending on the relevant time period. The Complaint has not been amended
to allege specific facts about Fatehy Abdo Ali Mohamed, who the Court understands is the uncle
of the Remaining Beneficiaries.  Defendants have assumed for the purposes of the instant motion
that the facts alleged regarding Plaintiff Abdo Ali Mohamed's citizenship are true of Plaintiff
Fatehy Abdo Ali Mohamed.  Motion at 8 n. 5.  The Court does the same.
[2] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28
U.S.C. § 636(c).

United States District Court
Northern District of California

1    visa, the beneficiary must, among other things, appear for an in-person interview with a consular

2    officer. 8 U.S.C. § 1202(h); 22 C.F.R. § 42.62. "When a visa application has been properly

3    completed and executed before a consular officer in accordance with the provisions of the INA

4    and the implementing regulations, the consular officer must issue the visa, refuse the visa under

5    INA 212(a) or 221(g) or other applicable law or, pursuant to an outstanding order under INA

6    243(d), discontinue granting the visa." 22 C.F.R. § 42.81.

   **B.    The Proclamation**

7

8        On September 24, 2017, the president of the United States issued Proclamation 9645,

9    entitled "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the

10   United States by Terrorists or Other Public-Safety Threats." 82 FR 45161.  Section 2(g)(ii) of the

11   Proclamation restricted entry of Yemeni nationals seeking immigrant visas and nonimmigrant

12   business or tourist visas. *Id.*  The Proclamation did not apply, however, to individuals who had "a

13   valid visa on the applicable effective date" under the Proclamation.  *Id.* Section 3(ii).  It further

14   provided that "No immigrant or nonimmigrant visa issued before the applicable effective date . . .

15   shall be revoked pursuant to this proclamation." *Id.*  Section 6(c).  The effective date as to the

16   visas at issue in this case was October 18, 2017.  *Id.*  Section 7(b)(i).

17       The Proclamation also afforded consular officers, among others, the discretion "to grant

18   waivers on a case-by-case basis to permit the entry of foreign nationals for whom entry is

19   otherwise suspended or limited . . . ." *Id.* Section 3(b)(vi). Waivers could be granted only if 1)

20   "denying entry would cause the foreign national undue hardship;" 2) "entry would not pose a

21   threat to the national security or public safety of the United States;" and 3) entry would be in the

22   national interest." *Id.* Section 3(c)(i).

23       On January 20, 2021, after this case was initiated, the Proclamation was revoked by

24   Presidential Proclamation No. 10141. *See* 86 Fed. Reg. 7005 (Jan. 25, 2021).

   **C.    Allegations in the Complaint Relevant to Remaining Beneficiaries**

25

26       Abdo Ali Mohamed was a United States citizen who resided in Buffalo, New York.

27   Compl. ¶ 150.  In 2001, he filed an I-130 petition seeking a visa for his son, Mohamed Abdo Ali

28   Mohamed, and his son's family, to join him in the United States. *Id.*  ¶ 151.  The I-130 petition

3

was approved nine years later, on May 20, 2010.  *Id.*

In September 2015, Mohamed Abdo Ali Mohamed and his children (including the Remaining Beneficiaries) were interviewed at the United States embassy in Malaysia and were informed that their visas had been approved.  *Id.* ¶¶ 153-155. A few days later, however, Mohamed Abdo Ali Mohamed was contacted by the Embassy and informed that "there was an issue related to his last name as it appeared in two different documents, and that he would need to address this issue with USCIS before he could receive the visas." *Id.* ¶ 155. "The official also informed him that his visa would still be there upon resolving the issue with USCIS." *Id.* Almost two years later, in May 2017, Mohamed Abdo Ali Mohamed received an e-mail from the Embassy in Djibouti informing him that he had been scheduled for a new interview on July 5, 2017. *Id.* ¶ 159. The visas still had not been issued.

At the conclusion of the July 5, 2017 interview, "the consular official told Mohamed Abdo Ali Mohamed that his visa was approved and provided him with a notice stating that the visa was approved and identifying his redress number, SAA2010640018." *Id.* ¶ 160 & Ex. 19. Exhibit 19 to the Complaint is a printed form, with the redress number hand-written at the top, stating, in part:

> Your visa is approved. We cannot guarantee how long it will take to print it and have your passport ready for pickup.  You should check the status of your visa online at https://ceac.state.gov/ceacstatracker/statusaspx.

Compl., Ex. 19. The consular officer took the family's passports and the family understood that there were no further steps in the process except "the ministerial act of printing out the visas," as indicated in the visa approval notices. *Id.* ¶¶ 7, 161.

Then, on January 2, 2018, "the Embassy returned the family's passports and provided Mohamed Abdo Ali Mohamed with a letter stating that his application for a visa has been denied due to the Proclamation and that he would not be granted a waiver.  *Id.* ¶ 163 & Ex. 20. Plaintiff alleges, on information and belief, that the consulate was "acting . . . according to instructions from President Donald Trump, Secretary Michael Pompeo (and/or his predecessors in office), and/or Secretary Kevin McAleenan (and/or his predecessors in office)." *Id.* ¶ 12. According to Plaintiff, Defendants had "no lawful authority—from the Proclamation or otherwise—to refuse to

4

provide the visas granted to Plaintiffs' Beneficiaries before the Proclamation was implemented." *Id.* ¶ 17.  "Defendants' actions were . . . contrary to public statements by the State Department, which stated on its website, 'No visas will be revoked pursuant to [Presidential Proclamation] 9645. Individuals subject to [Presidential Proclamation] 9645 who possess a valid visa or valid travel document generally will be permitted to travel to the United States, irrespective of when the visa was issued.' " *Id.*  ¶ 15. Plaintiff further asserts that "[i]n order to correct their ultra vires actions, Defendants and their agents and employees must be compelled to undertake their non-discretionary duty to render the previously authorized visas to Plaintiffs' Beneficiaries." *Id.* ¶ 16.

In the Complaint, Plaintiff named as defendants the President of the United States, the Secretary of State and the Director of the Department of Homeland Security ("DHS"). Plaintiff asserts the following claims: 1) violation of the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2)(A), based on the allegation that Defendants' actions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; 2) violation of Plaintiff's substantive and procedural due process rights under the Fifth Amendment  Due Process Clause based on "Defendants' actions, practices, and failure to issue Plaintiffs' Beneficiaries' previously approved immigrant visas;" and 3) relief under the Mandamus Act, 28 U.S.C. § 1361.  Plaintiff seeks the following relief in the Complaint:  1) a finding that Defendants' instruction to the consular officers to deny the Remaining Beneficiaries' visas based on the Proclamation was unlawful, and 2) an order directing Embassy officials to issue the Remaining Beneficiaries' previously approved visas.

### D.    The Paterson Declarations

In connection with their original motion to dismiss, filed on July 23, 2021, Defendants filed two declarations by Courtney Paterson.  Dkt. nos. 49-1 ("First Paterson Declaration"), 49-2 ("Second Paterson Declaration").  Paterson was employed by the U.S. Department of State as an Attorney Adviser in the Office of Consular Affairs in the State Department's Office of the Legal Adviser and was authorized to search the electronic Consular Consolidated Database ("CCD") of the U.S. Department of State, Bureau of Consular Affairs, for records of immigrant and nonimmigrant visa applications. First Paterson Decl. ¶ 1; Second Paterson Decl. ¶ 1.  According to Paterson, the CCD contains electronic data recording visa applications, and visas issued and

refused, at U.S. diplomatic and consular posts worldwide. First Paterson Decl. ¶ 2; Second Paterson Decl. ¶ 2.

In the First Paterson Declaration, Paterson describes the information in the CCD about the visa applications of the family members who were the subject of the I-130 applications filed by the plaintiffs who have now been dismissed from this case. The declaration reflects that by the end of 2020, all of these family members had received visas based on a finding of waiver under the Proclamation. *See generally* First Paterson Decl. For each plaintiff, the process described in the declaration included a "preliminary determination" by the consular officer in Djibouti that the "personal hardship and national interest prongs" were met, followed by "interagency review" and the collection of additional information or documents, culminating in a final determination by the consular officer that the family member was eligible for a waiver. *Id.*

The Second Paterson Declaration describes the information Paterson found in the CCD related to the I-130 application of Abdo Ali Mohamed. That information, according to Paterson, is as follows:

> The CCD reflects that the I-130 Immigrant Petition assigned case number AA2010640018 was filed by Abdo Ali MOHAMED on behalf of Mohamed Abdo Ali MOHAMED, year and place of birth: 1972, Yemen. The CCD reflects the following information regarding Mr. Mohamed's visa application.
>
> • On September 4, 2015, Mr. Mohamed appeared for an interview and applied for an immigrant visa at the U.S. Embassy in Kuala Lumpur. Mr. Mohamed applied with a derivative spouse, Thikra Nagi Abdulla ALQASMI, and five derivative children, Omar Mohamed Abdo MOHAMED, Ammar Moh~ed Abdo MOHAMED, Emad Mohamed Abdo MOHAMED, Mayada Mohamed Abdo MOHAMED, and Lamia Mohamed Abdo MOHAMED. Another daughter, Ghada Mohamed Abdo MOHAMED, did not make a visa application as she was married and no longer eligible as a child derivative under INA §101(b(1). The consular officer refused the immigrant visa applications under INA §221(g), 8 U.S.C. §1201(g), and returned the I-130 Immigrant Petition to United States Citizenship and Immigration Services ("USCJS,,) for review and possible revocation.
>
> • On December 26, 2016, the consular section at the U.S. Embassy in Djibouti received notification that USCIS reaffirmed the I-130 Immigrant Petition and contacted Mr. Mohamed to appear for interview in connection with his visa application on January 24, 2017.
>
> • On January 24, 2017, Mr. Mohamed failed to appear.

United States District Court
Northern District of California

6

• On July 5, 2017, Mr. Mohamed appeared for interview in connection with his immigrant visa application at the U.S. Embassy in Djibouti. The consular officer refused the immigrant visa application under INA §22l(g), 8 U.S.C. §1201(g).

• On January 8, 2018, the consular officer refused the immigrant visa application under INA §212(t), 8 U.S.C. §l 182(f), in accordance with Presidential Proclamation 9645 and considered Mr. Mohamed for a waiver of the Proclamation's entry restrictions.

• On October 13, 2019, the consular officer found Mr. Mohamed was not eligible for a waiver of the Proclamation's entry restrictions. His visa application remains refused in accordance with Presidential Proclamation 9645.

• On March 1, 2020, the consular section at the U.S. Embassy in Djibouti received additional information from Mr. Mohamed's legal representative seeking reconsideration of his waiver denial. After reviewing this information, a consular officer again determined that Mr. Mohamed was not eligible for a waiver of the Proclamation's entry restrictions.

• On July 23, 2020, the consular officer again refused the immigrant visa application under INA §212(t), 8 U.S.C. §1182(f), in accordance with Presidential Proclamation 10014 as extended by Presidential Proclamation 10052.

• On March 16, 2021, Mr. Mohamed appeared for an interview in connection with his immigrant visa application at the U.S. Embassy in Djibouti. On March 17, 2021, a consular officer refused Mr. Mohamed's immigrant visa application under INA§ 212(a)(6)(C)(i) due to fraud or misrepresentation in an attempt to obtain a visa or entry to the United States. The CCD shows that Mr. Mohamed and/or his attorneys were notified by email of this refusal and its statutory basis on March 17, 2021.

• Further, the CCD shows that in the course of this interview, Mr. Mohamed informed the consular officer that his petitioner had passed away. The consular officer informed Mr. Mohamed that the petition would be returned to USCIS and that the applicant would need to request a substitute petitioner. The CCD shows that Mr. Mohamed's attorneys were notified by email on March 17, 2021 that the applicant had informed the consular officer of the petitioner's passing, that the petition would be returned to USCIS, and that the applicant would need to contact USCIS to request approval for a substitute petition.

Second Paterson Decl. ¶ 5.

**E.    Joint Stipulation of Dismissal**

On October 11, 2024, the parties submitted a joint stipulation of dismissal as to Plaintiff Fatehy Abdo Ali Mohamed's claims with respect to I-130 beneficiaries Mohamed Abdo Ali Mohamed, his wife Thikra Nagi Abdulla Alqasmi, and two of their children (Omar Mohamed

Abdo Mohamed, and Ammar Mohamed Abdo Mohamed) on the basis that all of them had been issued visas and entered the United States. Dkt. no. 96, 97.

**F.    The Hines Declaration**

In support of the instant motion, Defendants have supplied the Declaration of Rachel Hines.  Dkt. no. 98-2 ("Hines Decl.").  Like Paterson, Hines is employed by the U.S. Department of State as an Attorney Adviser in the Office of the Assistant Legal Adviser for Consular Affairs and is authorized to search the CCD.  Hines Decl. ¶ 1.  Hines provides updated information about the visa applications of the Remaining Beneficiaries, stating as follows:

> 3. I have reviewed the CCD's visa records of Emad Mohamed Abdo Mohamed, Mayada Mohamed Abdo Mohamed, and Lamia Mohamed Abdo Mohamed, case number SAA2010640018, whose follow-to-join derivative visa application refusals are the subject of *Dobashi v. Biden*, No. 19-3338 (N.D. Cal.). This Declaration sets forth a true and correct summary of information available in the CCD regarding these three visa applications.
>
> 4. The CCD reflects that on August 4, 2024, these three derivative beneficiaries appeared for a consular interview at the U.S. Embassy in Djibouti and made and executed applications for immigrant visas as follow-to-join derivatives of Mohamed Abdo Ali Mohamed. The CCD further reflects that a consular officer refused each visa application pursuant to 8 U.S.C. § 1201(g), as the applicants were married and thus no longer eligible as derivatives of Mr. Mohamed. A copy of the refusal notice is attached as Tab A. Additional correspondence explaining the refusal and dated September 10, 2024, is attached as Tab B. The CCD does not reflect that these visa applicants were previously issued immigrant visas.

Hines Decl. ¶¶ 3-4.

The refusal notice states, in part:

> During the intake process, all three applicants provided their marriage certificates. They mentioned that due to the extended immigration process, they made the decision to marry. During the interview, it was explained to the applicants that marrying results in a loss of "child" status according to immigration regulations (9 FAM 502.1-1(D)(5)).
>
> The applicants were informed that there isn't a visa category available specifically for married derivatives, meaning they no longer qualify as dependents in the case. It was explained that currently they do not meet the criteria for the F3 visa category.

Hines Decl., Tab A.

Correspondence between counsel for the Remaining Beneficiaries and the Djibouti consulate reflects that counsel took the position that the Remaining Beneficiaries' eligibility for a

United States District Court
Northern District of California

8

visa should be evaluated based on the facts at the time their visas were denied under the Proclamation, in 2018.  Hines Decl., Tab B at ECF p. 7 ("as a legal matter, our clients should be treated as if they occupied the same position as they did in 2018 when their visas were improperly revoked: unmarried and thus eligible to receive their visas that were improperly revoked in 2017.").  The consulate responded that "[f]or adjudication purposes, the eligibility for a visa is evaluated at the time of interview."  *Id.* at ECF p. 6.

### G.    Contentions of the Parties

#### 1.  The Motion

In the Motion, Defendants contend Plaintiff's APA and Fifth Amendment Due Process claims fail to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure under the doctrine of consular nonreviewability.  Motion at 1. They further assert that the Fifth Amendment claim fails because Plaintiff has no constitutional due process rights with respect to the visa applications of the Remaining Beneficiaries.  *Id.*  at 1-2 (citing *Dep't of State v. Muñoz*, 144 S. Ct. 1812, 1821-22, 1826 (2024)). Defendants argue that the Mandamus Act claim should be dismissed because it is moot and the Court lacks subject matter jurisdiction over it.  *Id.*  at 2.  Finally, they contend the case should be dismissed under Rule 12(b)(3) because venue is improper in the Northern District of California under 28 U.S.C. § 1391(e)(1).  *Id.*

Defendants assert that Plaintiff's APA claim is barred under the doctrine of consular nonreviewability because Plaintiff seeks judicial review of a consular officer's decision to issue or refuse a visa. *Id.* at 12-14.   In particular, Defendants assert that a consular officer has denied the visa applications of the Remaining Beneficiaries under 8 U.S.C. § 1201(g) because they are married and therefore no longer qualify as a derivative "child" of Mohamed Abdo Ali Mohamed. *Id.* at 12 (citing Decl. of Rachel Hines, Ex. 1, Tabs A-B). According to Defendants, Plaintiff does not challenge this determination on the merits and in any event, this decision is not subject to judicial review under the doctrine of judicial nonreviewability, which "renders consular officer visa decisions unreviewable under the APA."  *Id.*  at 12-13 (citing *Allen v. Milas*, 896 F.3d 1094 (9th Cir. 2018);  *Algzaly v. Pompeo*, No. 20-cv-03322-JCS, 2021 WL 175875 at *7 (N.D. Cal). Jan. 19, 2021) (affirmed sub nom *Algzaly v. Blinken*, 21-16375, 2022 WL 2235785 (9th Cir. June

1    22, 2022))).

2          According to Defendants, even if the 2018 denial of the Remaining Beneficiaries' visa

3    applications is characterized as a revocation – a characterization that Defendants contend is

4    inaccurate because there is no allegation or evidence that visas were ever issued for the Remaining

5    Beneficiaries – the doctrine applies because that decision also was within the consular officer's

6    discretion.  *Id.* at 13 (citing Hines Decl., ¶ 4 (stating that no visa was ever issued to the Remaining

7    Beneficiaries); 22 C.F.R. § 42.82(a) ("A consular officer, the Secretary, or any Department official

8    to whom the Secretary has delegated this authority is authorized to revoke an immigrant visa at

9    any time, in his or her discretion.");  *Saavedra Bruno v. Albright*, 197 F.3d 1153 (D.C. Cir. 1999)).

10          Defendants contend Plaintiff cannot avoid the doctrine of consular nonreviewability by

11    arguing that his challenge is only to the visa *process* followed by the consulate as such challenges

12    also fall within the ambit of the doctrine.  *Id.*  at 13 (citing *Capistrano v. Dep't of State*, 267 F.

13    App'x 593, 594-95 (9th Cir. Feb. 19, 2008)).

14          Defendants argue that the doctrine of consular nonreviewability also bars Plaintiff's due

15    process claim.  *Id.* at 14.  Furthermore, they assert, Plaintiff fails to state a claim for violation of

16    either his procedural or substantive due process rights.  *Id.*  First, they argue that in *Dep't of State*

17    *v. Muñoz,* the Supreme Court held "that a U.S. citizen has no constitutional right to participate or

18    assert procedural rights with respect to 'someone else's' visa application and is 'not

19    constitutionally entitled' to a 'facially legitimate and bona fide reason' for why that visa was

20    denied."  *Id.* (quoting *Muñoz*, 144 S. Ct. at 1825–28).  According to Defendants, the Court in

21    *Muñoz* made clear that the Ninth Circuit's reading of its prior decision in *Kleindienst v. Mandel*,

22    408 U.S. 753 (1972), finding that citizens may have procedural due process rights in the visa

23    proceedings of their spouses, is incorrect.  *Id.* (quoting *Muñoz*, 144 S. Ct. at 1826 (citing *Mandel*,

24    408 U.S. 753)). Therefore, Defendants contend, Plaintiff has no procedural due process rights as to

25    the processing the visa applications of the Remaining Beneficiaries.  *Id.*

26          Nor does Plaintiff have a right to substantive due process, Defendants assert.  *Id.* at 14.  In

27    particular, while Plaintiff alleges that he has a liberty interest in family reunification, the Ninth

28    Circuit and the Supreme Court "have both declined to find U.S. citizens have a constitutionally

United States District Court
Northern District of California

protected fundamental liberty interest in the admission of noncitizen family members.[,]" according to Defendants. *Id.* Furthermore, Defendants assert, the Court in *Muñoz*, "held that a U.S. citizen does not have a fundamental liberty interest in a noncitizen spouse being admitted to the country." *Id.* (citing 144 S. Ct. at 1821). Defendants contend the Court in that case rejected the assertion that the fundamental right to marriage and interest in familial cohabitation 'includes the right to have her noncitizen husband enter (and remain in) the United States,' which 'involves more than marriage and more than spousal cohabitation[.]' " *Id.* (quoting 144 S. Ct. at 1822). And "[e]ven before *Muñoz*, the Ninth Circuit rejected claims brought by U.S. citizens asserting a protected liberty interest in a non-spousal family members' visa application[,]" according to Defendants. *Id.* at 16 (citing *Khachatryan v. Blinken*, 4 F.4th 841, 858-60 (9th Cir. 2021); *Chheng v. U.S. Dep't of Homeland Security*, No. 21-17040, 2023 WL 5665763, at *1 (9th Cir. Sept. 1, 2023)).

Defendants argue that the Mandamus Act claim is moot because Plaintiff is seeking to compel action on the Remaining Beneficiaries' visa application but the consular officer has now taken action on the visa application. *Id.* at 17. In particular, on August 4, 2024, the Remaining Beneficiaries appeared for a consular interview at the U.S. Embassy in Djibouti and were denied visas pursuant to 8 U.S.C. § 1201(g), as the applicants were married and thus no longer eligible as derivative beneficiaries. *Id.* (citing generally Hines Decl.); *see also id.* at 9 (citing Consular Electronic Application Center ("CEAC Database"), Visa Status Check, available at: https://ceac.state.gov/CEACStatTracker/Status.aspx?App=IV (indicating visas are "refused" for derivative applicants SAA2010640018 06 DJI, SAA2010640018 07 DJI, SAA2010640018 08 DJI)).

Second, Defendants assert that because they are not consular officers and only consular officers have the authority to issue visas, the mandamus relief Plaintiff seeks is unavailable. *Id.* at 18 (citing 8 U.S.C. §§ 1101(a)(9) and (16), 1201(a)(1); 22 C.F.R. §§ 42.71, 42.81). In particular, because they are not consular officers, Defendants have no nondiscretionary ministerial duty to adjudicate visa applications and have no authority to take the actions Plaintiff seeks to compel, namely, issuance of visas to the Remaining Beneficiaries. *Id.* Nor is there any authority

United States District Court
Northern District of California

1  establishing that Defendants have any mandatory nondiscretionary duty to *print* visas, Defendants

2  assert. *Id.*

3       Defendants further assert the case should be dismissed under Rule 12(b)(3) of the Federal

4  Rules of Civil Procedure, based on improper venue, arguing that venue is improper under 28

5  U.S.C. § 1391(e)(1) because the only remaining Plaintiff is Fatehy Abdo Ali Mohamed and

6  Plaintiff does not allege that he resides in this district. *Id.* at 19.  Defendants point out that the two

7  plaintiffs who resided in this district at the time the case was filed have now been dismissed from

8  the case. *Id.*  According to Defendants, Plaintiff also cannot establish venue in this district under

9  the alternative statutory provisions of § 1391(e)(1), providing for venue in a judicial district where

10  "a defendant in the action resides," or where "a substantial part of the events or omissions giving

11  rise to the claim occurred, or a substantial part of property that is the subject of the action is

12  situated." *Id.*   As to the former, Defendants assert that they reside in or near Washington, D.C.  *Id.*

13  As to the latter, they assert that the relevant events occurred in Djibouti, where the consular

14  officer who denied their visa application is based.  *Id.*

15       Finally, Defendants ask that the Court take judicial notice of the information in the CEAC

16  database and the Hines and Paterson Declarations.

17               **2.  Opposition**

18       Plaintiff contends Defendants have "fail[ed] to grapple with the basic facts alleged in the

19  Complaint, namely, Defendants' continued and unlawful refusal to deliver visas that were

20  undisputedly approved by consular officials not once, but twice: in September 2015 and again in

21  July 2017."  Opposition at 1.  According to Plaintiff, "[d]ue to Defendants' failure to issue these

22  approved visas, Plaintiff's family members have been stuck in a war zone, unable to reunite with

23  Plaintiff and their other family members in the United States." *Id.* Plaintiff argues that the

24  doctrine of consular nonreviewability "clearly does not apply" and that "none of Plaintiff's causes

25  of action challenge discretionary decisions by consular officers that are beyond the reach of

26  judicial review." *Id.*  Rather, Plaintiff asserts, he challenges the consular officer's revocation of

27  the Remaining Beneficiaries' visas, without any exercise of discretion, based on a

28  "misappl[ication] of a Presidential directive that was issued by then-President Trump." *Id.*

United States District Court
Northern District of California

1    Because the visa application of the Remaining Beneficiaries had already been twice approved,

2    however, Defendants had a mandatory non-discretionary duty to issue the visas, Plaintiff argues.

3    *Id.*

4        Plaintiff asserts that "[t]he only discretionary acts of consular officers mentioned in the

5    Complaint occurred in 2015 and 2017 when a consular officer *approved* Plaintiff's family

6    members' visas, including the visas of the Remaining Beneficiaries." *Id.* at 8 (emphasis in

7    original). According to Plaintiff, the conduct that is challenged in the Complaint is Defendants'

8    "unlawful instructions to Embassy officials to erroneously apply the Proclamation and revoke

9    [the] approved visas [of the Remaining Beneficiaries], in violation of the plain terms of the

10   Proclamation." *Id.* (citing Compl. ¶¶ 16-18). Consistent with that theory, "[t]he relief sought by

11   Plaintiff is (1) a finding by this Court that Defendants' instructions were unlawful, and (2) an

12   order directing Embassy officials to take the ministerial, nondiscretionary step of issuing the

13   Remaining Beneficiaries' approved visas." *Id.*

14       Plaintiff emphasizes that the Complaint does *not* challenge the "discretionary decision to

15   issue and enforce the Proclamation itself." *Id.* at 9. Instead, the Complaint asserts that the

16   Proclamation had "no legal force as applicable to Plaintiffs' Beneficiaries" and therefore, that the

17   consular officer had no authority to revoke the Remaining Beneficiaries' visas based on the

18   Proclamation. *Id.* (citing *Gill v. Mayorkas*, No. C20-939 MJP, 2021 WL 3367246, at *8 (W.D.

19   Wash. Aug. 3, 2021)). Therefore, Plaintiff asserts, the doctrine of consular nonreviewability does

20   not apply. *Id.* (citing *Wong v. Dep't of State*, 789 F.2d 1380, 1386 (9th Cir. 1986)).

21       Plaintiff argues further that application of the doctrine of consular nonreviewability under

22   the circumstances here would be contrary to its purpose. *Id.* at 10. According to Plaintiff, "[t]he

23   purpose of the doctrine has been to accord due deference to the careful and individualized

24   deliberative processes conducted by consular officials in embassies throughout the world." *Id.*

25   (citing *Tamjidi v. Blinken*, No. 8:24-CV-00403 HDV JDE, 2024 WL 4328813, *4 (C.D. Cal. Aug.

26   27, 2024)). Application of the doctrine here, though, would "shield [a] facially illegitimate

27   application of the Proclamation from judicial review." *Id.* According to Plaintiff, the executive

28   branch's "*en masse* revocations of approved visas . . . is precisely the kind of executive action this

United States District Court
Northern District of California

1    Court is competent to review without implicating any of the concerns behind the doctrine of

2    consular nonreviewability . . . [and] [i]ndeed, judicial review in this case is consistent with the

3    original intent behind the separation of powers." *Id.*

4         Plaintiff also asserts that the Complaint states a valid APA claim because "consular

5    officers' failure to follow a 'nondiscretionary, ministerial duty' is subject to review under §

6    706(2)(A)." *Id.* at 11 (citing *Rivas v. Napolitano*, 714 F.3d 1108, 1111–13 (9th Cir. 2013); *Jane

7    Doe 1 v. Nielsen*, 357 F. Supp. 3d 972, 1004 (N.D. Cal. 2018)).  According to Plaintiff, "[t]he

8    APA provides a cause of action for review of precisely this kind of 'final agency action,' and there

9    is a broad presumption in favor of judicial review of such actions, including in the immigration

10   context." *Id.* (citing 5 U.S.C. §§ 554, 706(2)(A); *Emami v. Nielsen*, 465 F. Supp. 3d 991, 995

11   (N.D. Cal. 2020)).  The nondiscretionary, ministerial duty at issue here, Plaintiff contends, is the

12   consular officer's mandatory duty under 22 C.F.R. § 42.81(a) to review and "issue the visa." *Id.*

13   (citing *Patel v. Reno*, 134 F.3d 929, 932 (9th Cir. 1997) ("[A] consular officer is required by law

14   to act on visa applications [u]nder 22 C.F.R. § 42.81")).  According to Plaintiff, once his

15   beneficiaries' "visas were approved, as alleged in the Complaint, Defendants had a mandatory,

16   nondiscretionary duty to print the visas and place them into the Remaining Beneficiaries'

17   passports." *Id.*  "Their failure to do so was arbitrary and capricious, in violation of the APA." *Id.*

18   (citing 5 U.S.C. § 706(2)(A); *Hernandez Castro v. Mayorkas*, No. 2:21-CV-00315-SAB, 2022 WL

19   1085682, at *7–8 (E.D. Wash. Apr. 11, 2022)).

20        Plaintiff also rejects Defendants' argument that he fails to state a valid due process claim,

21   arguing that *Muñoz* is distinguishable. *Id.* at 12-13.  According to Plaintiff, in *Muñoz* the Court

22   "held only that there is no liberty interest in family reunification inherent in the Due Process

23   Clause[,]" rejecting the visa petitioner's challenge of "a consular officer's discretionary denial of a

24   visa." *Id.*  Here, in contrast, Plaintiff contends he has a property interest in the Remaining

25   Beneficiaries' visa applications because they had already been *approved* when the consular officer

26   purported to deny the visas in 2018. *Id.* at 12.  Therefore, Plaintiff contends, *Muñoz* does not

27   defeat his due process claim. *Id.* According to Plaintiff, this case is similar to *Ching v. Mayorkas*,

28   725 F.3d 1149 (9th Cir. 2013), in which "the Ninth Circuit recognized that the grant of an I-130

United States District Court
Northern District of California

1    petition is a 'protected interest [] entitled to the protections of due process.'" *Id.* (citing 725 F.3d at

2    1156). Plaintiff asserts, "Just as the approval of an I-130 petition is a 'matter of right,' once a

3    consular official approved the Remaining Beneficiaries' visas, Defendants had a mandatory,

4    nondiscretionary duty to print the approved visas and place them in Plaintiff's Beneficiaries'

5    passports, and Plaintiff had a 'protected interest' in the mandatory issuance of the approved visas."

6    *Id.* at 13.

7          Further, Plaintiff asserts, "Once Plaintiff obtained this property interest, Defendants could

8    not deprive him of it without due process of law." *Id.* Instead, he contends, "[w]hen Defendants

9    unlawfully implemented the Proclamation and revoked the Remaining Beneficiaries' approved

10   visas, Plaintiff was deprived of this protected interest without any procedural protections." *Id.*

11   Plaintiff concedes that "the holding in *Muñoz* may mean that [his] interest is 'limited,'" but

12   asserts, "that does not mean the interest is nonexistent, as Defendants argue." *Id.* (citing *Hanan v.*

13   *U.S. Citizenship and Immig. Servs*., No. 23-CV-02414-HSG, 2024 WL 4293917, at *12 (N.D. Cal.

14   Sept. 25, 2024)).

15         Plaintiff also rejects Defendants' argument that the Mandamus Act claim is moot, asserting

16   that the Court should not consider evidence relating to the August 2024 denial of the Remaining

17   Beneficiaries' visa application at this stage of the case because "the impact of that evidence is

18   factually and legally contested." Opposition at 14. Furthermore, Plaintiff asserts, the mootness

19   question is so intertwined with the merits that it would be improper to dismiss the Mandamus Act

20   claim based on mootness at the pleading stage. *Id.* In particular, Plaintiff contends that in order to

21   accept Defendants' mootness argument "this Court would not only have to accept as true that

22   consular officials ultimately refused the Remaining Beneficiaries' visa applications, but also

23   accept either that doing so after initially approving them—but failing to issue the visas, as

24   required—was a proper exercise of discretionary authority, or, if doing so were improper, that this

25   Court can do nothing to redress the harms that followed." *Id.*

26         Plaintiff further asserts that he has stated a valid Mandamus Act claim "because '(1) [his]

27   claim is clear and certain; (2) the official's duty is nondiscretionary, ministerial, and so plainly

28   prescribed as to be free from doubt, and (3) no other adequate remedy is available.' " *Id.* at 15

1    (quoting *Patel*, 134 F.3d at 931).  Here, he contends, these elements are met.  *Id.*

2          First, "Plaintiff asserts that [f]ederal law requires Defendants to act on visa applications,

3    including by timely issuing approved visas."  *Id.* at 15-16. In particular, "[u]nder 22 C.F.R. §

4    42.81, once a visa applicant has completed the steps necessary to apply for a visa, 'the consular

5    officer *mus*t issue the visa, refuse the visa under INA 212(a) or 221(g) or other applicable law or,

6    pursuant to an outstanding order under INA 243(d), discontinue granting the visa.' "  *Id.*  at 15

7    (emphasis added in Plaintiff's brief). According to Plaintiff, this regulation "imposes

8    nondiscretionary duties" on consular officers.  *Id.* (citing *Patel*, 134 F.3d at 932;  *Golkar v. Kerry*,

9    570 F. App'x 657, 659 (9th Cir. 2014)). In this case, the consulate had a duty to print the approved

10   visas and affix them to the passports of the Remaining Beneficiaries, Plaintiff asserts.  *Id.* at 15-

11   16.  According to Plaintiff, "[u]nder § 42.81, Defendants' continuing delay was and remains

12   improper."  *Id.*

13         Second, Plaintiff rejects Defendants' contention that because they are not consular officers,

14   they cannot provide the relief Plaintiff seeks in this action, namely, issuance of the Remaining

15   Beneficiaries' visas.  *Id.* at 16.  Plaintiff asserts that "Defendants owe visa applicants like the

16   Remaining Beneficiaries a nondiscretionary, ministerial duty to administer and implement the

17   INA and corresponding regulations, including by ensuring that consular officers timely issue

18   approved visas." *Id.*  According to Plaintiff, courts have held that this duty applies to "executive

19   agencies and high-ranking officials."  *Id.*  at 17 (citing *Singh v. Holder*, No. C-13-4958, 2014 WL

20   117397, at *7 (N.D. Cal. Jan. 10, 2014); *Pars Equality Center v. Blinken*, No. 24-CV-00001, 2024

21   WL 4700636, at *12 (N.D. Cal. Nov. 5, 2024)). Furthermore, Plaintiff argues, the fact that

22   Defendants themselves do not issue visas does not mean that they have no mandatory duties with

23   respect to issuance of visas.  *Id.* Rather, Plaintiff contends Defendants have a mandatory duty to

24   ensure that the "agencies they oversee . . . process visa applications and issue approved visas in a

25   timely manner."  *Id.*

26          Plaintiff asserts that Defendants' reliance on *Patel* to argue that they do not have any

27   mandatory duties with respect to issuance of visas is incorrect as a matter of law.  *Id.* (citing

28   Motion at 18) (citing *Patel*, 134 F.3d at 933). According to Plaintiff, while *Patel* held that only

United States District Court
Northern District of California

consular officers can issue visas, it said nothing about Defendants' other obligations related to the issuance of visas. *Id.* at 16-17. Plaintiff contends that "under the APA, INA, and corresponding regulations, Defendants, their departments, and their subordinate consular officers owed Plaintiff and his beneficiaries not only timely resolution of their visa applications, but also timely issuance of the beneficiaries' approved visas by affixing them to their passports." *Id.* at 17.

Plaintiff asserts that Defendants should not be permitted to argue that the denials of the Remaining Beneficiaries' visa applications in 2024 "absolve Defendants of their erroneous and unlawful decision to withhold Plaintiff's Beneficiaries' visas seven years earlier." *Id.* Plaintiff further asserts that the doctrine of equitable estoppel prevents Defendants from relying on the 2024 denials. *Id.* According to Plaintiff, all of the elements required for equitable estoppel are met because "Defendants knew the Proclamation did not apply to Plaintiff's Beneficiaries and, for years, led Plaintiff into believing that Defendants would correct this misapplication (which Defendants corrected for all of the other beneficiaries of the dismissed plaintiffs and all of Plaintiff's other beneficiaries). The Remaining Beneficiaries detrimentally relied upon the approval of their applications and Defendants' corrective actions by repeatedly traveling through war zones to obtain their approved visas." *Id.*

Plaintiff further contends Defendants engaged in "affirmative misconduct" by withholding "Plaintiff's Beneficiaries' approved visas for years under the plainly inapplicable Proclamation[.]" *Id.* (citing *Villena v. INS*, 622 F.2d 1352, 1360–61 (9th Cir. 1980) (finding the "affirmative misconduct" requirement met where the government was under a duty to act and failed to do so "almost four years later")). In addition, he argues that "[e]stoppel would . . . not 'unduly damage the public interest' because 'the public interest would not be burdened by allowing [Plaintiff] to have his claim[s] properly considered as if the events arising out of the government's actions had not occurred.' " *Id.* (quoting *Salgado-Diaz v. Gonzales*, 395 F.3d 1158, 1166 (9th Cir. 2005), as amended (Mar. 10, 2005), opinion amended on reconsideration, No. 02-74187, 2005 WL 553046 (9th Cir. Mar. 10, 2005)).

Plaintiff also rejects Defendants' assertion that venue in this district is improper, arguing that "[t]he original plaintiffs' domicile within this judicial district is sufficient to establish proper

17

venue." *Id.* at 19-20.

### 3. Reply

In their Reply, Defendants reject Plaintiff's efforts to avoid the doctrine of consular nonreviewability and to defeat their challenge to subject matter jurisdiction. Reply at 1. As a preliminary matter, they contend Plaintiff's arguments are based "on a patently incorrect fact: that Emad Mohamed Abdo Mohamed, Mayada Mohamed Abdo Mohamed, and Lamia Mohamed Abdo Mohamed had visas that a consular officer or other State Department official revoked." *Id.* This is incorrect, Defendants assert, as a consular officer did not issue the Remaining Beneficiaries' visas and even if they had, the argument is a "red herring" because "consular officers must revoke visas for which applicants are not eligible under the [INA]." *Id.* According to Defendants, the marriages of the Remaining Beneficiaries "rendered them ineligible for derivative visas, a conclusion that was confirmed when they eventually sought visas in August 2024[,]" and therefore, Plaintiff's claims must be dismissed. *Id.*

Defendants argue that regardless of whether or not Plaintiff names the consular officer as a defendant, the facts and the allegations show that what is really being challenged is the denial of the Remaining Beneficiaries' visa applications – in September 2015, July 2017, and January 2018. Reply at 3 (citing Decl. of Courtney Paterson ¶ 5, dkt. no. 49, Ex. 2; Compl. ¶¶ 153-155, 163 & Compl. Ex. 20). Nor do Defendants have a non-discretionary duty to "print" the visas of the Remaining Beneficiaries, according to Defendants. *Id.* at 2.

Defendants contend Plaintiff's reliance on *Tamjidi v. Blinken*, No. 8:24-CV-00403 HDV JDE, 2024 WL 4328813 (C.D. Cal. Aug. 27, 2024) for the proposition that the doctrine of consular nonreviewability does not apply in this case is misplaced because that case involved a consular officer's alleged delay in adjudicating a visa application where there had been no final decision on the visa application. *Id.* at 3. According to Defendants, the doctrine of consular nonreviewability did not apply in *Tamjidi* because there had been no final decision on the visa application. *Id.* In contrast, Defendants assert, the consular officer here has made final decisions denying Plaintiff's Remaining Beneficiaries' visa applications, both on January 8, 2018 and on August 4, 2024. *Id.* at 4.

Defendants also reject Plaintiff's assertion that Presidential Proclamation No. 9645 "removed any discretion from the consular officer's decision-making[.]" *Id.* (quoting Opposition at 9). First, they contend the letter from the consular officer denying the Remaining Beneficiaries' visas based on the Proclamation casts doubt on this assertion. *Id.* Second, Defendants argue that the case cited by Plaintiff to support this argument, *Gill v. Mayorkas*, is not on point because in that case, the plaintiff brought an APA claim against U.S. Customs and Border Patrol ("CBP") challenging a CBP officer's determination to cancel a visa and deny admission into the United States. *Id.* (citing 2021 WL 3367246, at *1). According to Defendants, the court in that case rejected the defendant's reliance on the consular nonreviewability doctrine because the visa cancellation was not by a consular officer. *Id.* Defendants assert that to the extent Plaintiff asks the Court to review the consular officer's reliance on Presidential Proclamation No. 9645 to deny his derivative beneficiaries' visa applications, the claims are moot because the Proclamation "is no longer in effect and was not the reason Plaintiff's beneficiaries were refused visas after this date." *Id.* at 5.

Defendants also argue in their Reply that Plaintiff mischaracterizes his APA claim in the Opposition by claiming it is a challenge to "Defendants' fail[ure] to complete their mandatory, nondiscretionary duty to print and place the approved visas in his family members' passports." *Id.* at 6 (citing Opposition at 10). Defendants contend Plaintiff's assertion is inconsistent with the allegations in the Complaint, which alleges that Defendants have revoked his beneficiary's visa and that this revocation is "final agency action" subject to APA review under 5 U.S.C § 706(2). *Id.* (citing Compl. ¶¶ 224-27). In doing so, Defendants contend, Plaintiff conflates an APA delay claim with an APA review claim. *Id.* But according to Defendants, both claims fail. *Id.* In particular, Defendants argue that the APA review claim asserted in the Complaint fails under the doctrine of consular nonreviewability for the reasons previously set forth. *Id.* They contend the undue delay claim fails because there is no mandatory duty to "print" a visa or to issue an approved visa within a particular timeframe under the INA or the applicable regulations. *Id.* In any event, Defendants contend, Plaintiff's beneficiaries "received adjudications many times, including most recently on August 4, 2024[,]"; therefore, "Plaintiff cannot maintain an APA delay

claim under § 706(1) because the action that can be compelled has occurred." *Id.* at 8 (citing Compl., Ex. 20; Mot. to Dismiss, Ex. 1.)

With respect to the Mandamus Act claim, Defendants reject Plaintiff's assertion that the Court cannot consider the Hines Declaration, summarizing information from the CEAC database showing that the Remaining Beneficiaries' visa applications were denied on August 4, 2024. *Id.* at 9. Defendants contend the Court may properly consider evidence beyond the complaint to resolve a factual attack on subject matter jurisdiction without converting a motion to dismiss into a motion for summary judgment. Reply at 9 (citing *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000)). They argue that Plaintiff fails to demonstrate how the jurisdictional question of mootness is intertwined with the merits and assert that courts in the Ninth Circuit "consistently dismiss mandamus and APA undue delay claims as moot once the agency produces evidence it has acted." *Id.* at 10 (citing *Akimenko v. Mayorkas*, Case No. 21-cv-03738-DMR, 2022 WL 1539519, at *3 (N.D. Cal. May 16, 2022) (collecting cases)). According to Defendants, Plaintiff's argument is based on "a misreading of the statute and the regulations" and Plaintiff "seek[s] to compel action Defendants are not required to take." *Id.*

Finally, Defendants reject Plaintiff's argument that equitable estoppel bars Defendants from relying on the consular officer's August 4, 2024 denial of the Remaining Beneficiaries' visa applications. *Id.* at 10-11. According to Defendants, to apply equitable estoppel against the government, "a party must show that the potential injustice outweighs the possibility of damage to the public interest and that the elements of estoppel exist." *Id.* at 11 (citing *Salgado-Diaz v. Gonzales*, 395 F.3d 1158, 1166 (9th Cir. 2005)). Defendants contend the first requirement is not satisfied because it is "unclear what injustice Plaintiff has suffered" and, on the other side of the equation, there is a "strong public interest in courts not second guessing the political departments' exercise of a fundamental sovereign attribute embodied by the doctrine of consular nonreviewability." *Id.* Defendants contend there has been no injustice because the Proclamation has been rescinded and the Remaining Beneficiaries have now had the opportunity to have their visa applications decided without reference to the Proclamation. *Id.* To the extent the applications were denied based on their marriages, Defendants assert, the Remaining Beneficiaries' "decision

1    to marry is not an injustice foisted upon Plaintiff by Defendants." *Id.*

2            Defendants also argue that the elements of estoppel are not met. *Id.* Those elements

3    "require a showing that (1) the party to be estopped knows the facts; (2) the party intends that his

4    or her conduct will be acted on; (3) the claimant must be ignorant of the true facts; (4) and the

5    claimant must detrimentally rely on the other party's conduct." *Id.* (quoting *Salgado-Diaz v.*

6    *Gonzales*, 395 F.3d at 1166). Plaintiff cannot establish the third element, Defendants assert, "he

7    was aware that his derivative beneficiaries were married . . . [and] [he] was represented by

8    counsel, who could have researched derivative visa eligibility." *Id.* Defendants further contend

9    "Plaintiff cannot show the second and fourth elements because Defendants did not and could not

10   guarantee[ ] the issuance of a visa to an ineligible individual and it is unclear how Defendants'

11   willingness to readjudicate visa applications was to Plaintiff's detriment." *Id.*

12           Finally, Defendants argue that they should prevail on their venue challenge because

13   Plaintiff relies on an "absurd theory of venue" in which "to establish venue in a multi-plaintiff

14   suit, a litigant  need only name one plaintiff allegedly residing in the district where the complaint

15   is filed, then, before a party can challenge improper venue, the plaintiff can voluntarily dismiss the

16   one plaintiff alleged to reside in the district and yet establish proper venue in-perpetuity." *Id.* at

17   12.

18                    **4.  Defendants' Supplemental Brief**

19           In their supplemental brief, Defendants reject Plaintiff's assertion that they can be

20   compelled to adjudicate the visa applications of the Remaining Beneficiaries based on the facts as

21   they existed in 2017 under the doctrine of equitable estoppel. Dkt. no. 104 (Defendants'

22   Supplemental Brief) at 1. Defendants contend, a "noncitizen does not accrue 'reliance' interests in

23   the visa application process" that could give rise to estoppel because "a noncitizen has no right to

24   a visa and because a visa may be revoked both before and after entry into the United States." *Id*.

25   Furthermore, they assert, because decisions about "visa issuance and entry into the United States

26   are high stakes decisions that the Supreme Court has repeatedly held fall to the exclusive judgment

27   of the Executive and Legislative Branches[,]" awarding the equitable relief Plaintiff requests –

28   "order[ing] a consular officer or other Executive Branch official to ignore material facts about a

21

1    visa applicant's eligibility for a visa" under the INA – "would . . . set a dangerous precedent." *Id.*

2    Defendants also argue that even if the doctrine of equitable estoppel can be applied to visa

3    decisions, Plaintiff has not adequately pled the elements of equitable estoppel. *Id.* at 1-2.

4        Defendants argue that as a general rule, equitable estoppel may not be applied against the

5    government, "even though private parties may suffer hardship as a result in particular cases." *Id.*

6    at 2 (citing *Office of Personnel Management v. Richmond*, 496 U.S. 414, 419-22 (1990)).  Under

7    the circumstances of this case, Defendants contend, the doctrine of consular nonreviewability

8    precludes the application of equitable estoppel because "[a]ny relief, including application of

9    equitable estoppel, that prohibits a consular officer from applying a statutory ground of visa

10   ineligibility would encroach upon the constitutional principles at the root of the doctrine of

11   consular nonreviewability." *Id.* at 2-4.  Here, the Remaining Beneficiaries are now married and

12   therefore they are ineligible for derivative visas under the INA, Defendants assert.  *Id.* at 3 (citing

13   8 U.S.C. §§ 1153(a), (d); 1101(b)(1)).  That was the basis for the denial of their visas on August 4,

14   2024 and the Court does not have the power to overturn that decision, Defendants contend.  *Id.* at

15   3-4.

16       Defendants further assert that while there is no case that holds that a court can apply the

17   doctrine of equitable estoppel to "compel a consular officer not to apply a ground of visa

18   ineligibility or to issue a visa to an applicant who does not qualify for one[,]" there is a line of

19   Supreme Court cases "holding that equitable principles cannot be invoked to compel the

20   government to confer citizenship." *Id.* at 4-5. Defendants reject Plaintiff's reliance on *Salgado-*

21   *Diaz v. Gonzales* to support their assertion that equitable estoppel can be applied in this case,

22   arguing that that case is distinguishable.  *Id.* at 4.  According to Defendants, that case involved the

23   application of equitable estoppel in the context of deportation proceedings where the court found

24   that equitable relief was required to protect the plaintiff's due process rights.  *Id.* (citing 395 F.3d

25   1158, 1165-66 (9th Cir. 2005)).  Defendants contend the facts here are distinguishable because

26   Plaintiff has no due process rights as to the visa applications of the Remaining Beneficiaries, as

27   discussed above.  *Id.*

28       On the other hand, Defendants assert, the Supreme Court has found that "equitable

United States District Court
Northern District of California

United States District Court
Northern District of California

1    principles generally cannot be used to prevent the government from enforcing the laws established

2    by Congress" and on that ground has held that the government could not be compelled to confer

3    U.S. citizenship under the doctrine of equitable estoppel.  *Id.* at 5-6 (citing *U.S. Immig. and*

4    *Naturalization Serv. v. Hibi*, 414 U.S. 5 (1973); *I.N.S. v. Pangilinan*, 486 U.S. 875 (1988);

5    *Mustanich v. Mukasey*, 518 F.3d 1084 (9th Cir. 2008)). According to Defendants, the reasoning of

6    *Hibi*, *Pangilinan* and *Mustanich* also applies to visa issuance and therefore bars the relief Plaintiff

7    seeks here.  *Id.* In particular, Defendants argue, "[i]f the Court were to rely on equitable principles

8    to issue an order directing a consular officer to ignore material facts rendering a visa applicant

9    ineligible under the law, the Court would be creating a remedy in violation of the law set by

10    Congress." *Id.*

11          Next, Defendants argue that Plaintiff's attempt to invoke equitable estoppel is based on the

12    "false assumption that [the Remaining Beneficiaries] have some right to a visa."  *Id.*  at 6-7. In

13    fact, Defendants contend, "[a] noncitizen seeking entry into the United States has no fundamental

14    right of entry."  *Id.*  at 7 (citing *Khachatryan v. Blinken*, 4 F.4th 841, 849 (9th Cir. 2021)).

15    Likewise, Defendants argue, under *Muñoz*, Plaintiff has no "right in his beneficiary's derivatives

16    admission to the United States."  *Id.* (citing 602 U.S. at 909).  A "corollary" to this rule, according

17    to Defendants, is that because a consular officer has the discretion to revoke a visa – a decision

18    that is also subject to consular non-reviewability – "[t]here can thus be no reliance

19    interest in a consular officer's initial statement that a visa application would be approved, or is

20    approveable[.]"  *Id.*

21          Defendants reiterate their assertion that "[a]pplication of equitable estoppel in this manner

22    raises serious national security implications" and to illustrate this point offer a hypothetical

23    involving an individual who joins a terrorist organization a day after their visa is approved but

24    before it is issued.  *Id.* at 8. According to Defendants, under Plaintiff's theory, "the applicant can

25    return to the U.S. consulate and . . . demand the consular officer issue him the visa he was told was

26    approved."  *Id.*

27          Finally, Defendants argue that Plaintiff has failed to plead the elements of equitable

28    estoppel.  *Id.* at 8-12. First, they argue that Plaintiff has not alleged any "affirmative misconduct"

by Defendants. *Id.* at 9-11. According to Defendants, "affirmative misconduct" means a "deliberate lie" or "a pattern of false promises[;]" mere negligence is not enough. *Id.* at 8 (quoting *Mukherjee v. INS*, 793 F.2d 1006, 1009 (9th Cir. 1986)). Defendants argue that "[a] government official's mistaken provision of information to an individual or even a misstatement of law is merely negligent, not affirmative misconduct." *Id.* (citing *Mukherjee*, 793 F.2d at 1009). Furthermore, they assert, "[t]he failure to promptly process an application does not establish affirmative misconduct." *Id.* (citing *I.N.S. v. Miranda*, 459 U.S. 14, 18-19 (1982)). Defendants assert that Plaintiff's allegation that the consular officer erroneously denied a visa on the basis of the Proclamation is not sufficient to allege affirmative misconduct. *Id.* at 9-10. Similarly, they assert, Defendants' "mistaken communication to Plaintiff's beneficiaries that their visa applications are 'approved' rather than issued or refused—as required under statute and regulation—would at best be negligent." *Id.* at 10 (citing *Mukherjee*, 793 F.2d at 1009). In any event, the failure to immediately issue or refuse the visa was remedied when the consular officer refused the visa application based on the Proclamation, Defendants argue. *Id.* And to the extent Plaintiff relies on the delay in processing the applications before they were denied, Defendants contend delay is not affirmative misconduct. *Id.* (citing *Miranda*, 459 U.S. at 18-19; *Cortez-Felipe v. INS*, 245 F.3d 1054, 1057 (9th Cir. 2001)).

Defendants also reject the suggestion by Plaintiff that "Defendants' processing of the other Plaintiffs' beneficiaries' visa applications after the recission of Proclamation 9645 and consistent with the directives of Proclamation 10141 was wrongful action." *Id.* According to Defendants, "pursuant to Proclamation 10141, consular officers adjudicated all of the Plaintiffs' beneficiaries' visa applications without regard to Proclamation 9645[,]" which "is not a 'deliberate lie' or 'pattern of false promises' that would rise to the level of affirmative misconduct." *Id.* at 10-11.

Defendants argue further that the doctrine of equitable estoppel does not apply because Plaintiff has not alleged facts establishing either that Plaintiff will face a "serious injustice" or that "the public's interest will not suffer undue damage by imposition of the liability." *Id.* at 11 (quoting *Mukherjee*, 793 F.2d at 1008-09). Defendants argue that there can be no "serious injustice" to Plaintiff because he does not have a fundamental liberty interest, or any due process

24

1  rights, as to the visa applications of the Remaining Beneficiaries and therefore, his rights have not

2  been violated. *Id.* (citing *Muñoz*, 602 U.S. at 909; *Khachatryan*, 4 F.4th at 859; *Chheng*, No. 21-

3  17040, 2023 WL 5665763, at *1; *Sulit v. Schiltgen*, 213 F.3d 449, 454 (9th Cir. 2000)).   Nor can

4  the Remaining Beneficiaries demonstrate that they have faced serious injustice because they have

5  no right to a visa, Defendants assert. *Id.* Defendants also note that the Remaining Beneficiaries

6  "are not barred from entering the United States forever, they simply cannot enter under the visa

7  category for which they applied." *Id.*

8        On the other side of the scale, Defendants contend, is "the public interest of the

9  government exercising its sovereign authority to maintain normal international relations and

10  defend the country from foreign dangers." *Id.* at 11-12.  Defendants assert, "equitable

11  estoppel to bar consular officers from considering material facts that render noncitizen visa

12  applicants ineligible would undermine the public interest of protecting national security by

13  permitting the entry of noncitizens who are ineligible for visas." *Id.* at 12.  Thus, Defendants

14  assert, "the public interest should prevail" and Plaintiff "has not shown any entitlement to

15  equitable estoppel." *Id.*

16        **5.  Plaintiff's Response to Defendants' Supplemental Brief**

17        In his response, Plaintiff highlights the Ninth Circuit's statement in *Salgado-Diaz v.

18  Gonzales* that "[t]he government in immigration cases may be subject to equitable estoppel if it

19  has engaged in affirmative misconduct."  Dkt. no. 106 (Plaintiff's Response to Defendants'

20  Supplemental Brief ("Plaintiff's Response")) at 1 (quoting *Salgado-Diaz*, 395 F.3d 1158, 1165

21  (9th Cir. 2005)).  According to Plaintiff, in ruling on the Motion to Dismiss, the Court need not

22  decide whether Plaintiff is entitled to the ultimate relief it seeks;  rather, "[i]t need only hold, as

23  the Ninth Circuit did in *Salgado-Diaz*, that Defendants *may* be subject to estoppel if Plaintiff

24  proves its case after discovery[.]" *Id.* (emphasis added).  Plaintiff argues that because the Court

25  can award relief under the doctrine of equitable estoppel or the "related equitable doctrine that

26  permits the Court to order Defendants to consider Plaintiff's visa applications *nunc pro tunc*[,]"

27  namely, by ordering "Defendants to consider the Remaining Beneficiaries' visa applications as of

28  the date their applications were approved—in July 2017[,]" it should reject Defendants' assertion

1    that his claims are moot.  *Id.*

2         Plaintiff rejects Defendants' argument that the doctrine of consular nonreviewability bars

3    the relief he seeks, arguing that he has not asked the Court to "compel Embassy officials to reach a

4    particular conclusion."  *Id.*  at 1-2.  Instead, Plaintiff asserts, he "seeks either an order to print the

5    visas already issued, or alternatively an order that any further consideration of the Remaining

6    Beneficiaries' applications be *nunc pro tunc* to their July 2017 interview."  *Id.*  at 2. Such relief is

7    consistent with the Ninth Circuit's holding in *Salgado-Diaz,* Plaintiff argues, in which the court

8    "issued an order that 'the government cannot rely on the post-expulsion events its own misconduct

9    set in motion.'"  *Id.* (quoting *Salgado-Diaz*, 395 F.3d at 1166).

10        Plaintiff also points to *Torres v. Meissner*, noting that although this case was cited by

11   Plaintiff at the motion hearing, Defendants failed to address it in their supplemental brief.  *Id.*

12   According to Plaintiff, in *Torres*, "the court ordered immigration officials to *grant* an application

13   for lawful permanent resident status *nunc pro tunc* due to those officials' failure to timely

14   complete a background check process.  *Id.* (quoting *Torres*, 229 F.3d 1159 (9th Cir. 2000))

15   (emphasis in original).

16        Plaintiff also cites *Garcia v. U.S. Customs & Border Prot.*, No. CV215468DMGJEMX,

17   2021 WL 4815945, at *5–*6 (C.D. Cal. Aug. 20, 2021).  *Id.*  According to Plaintiff, in that case,

18   "the Central District of California addressed a motion for a preliminary injunction by a plaintiff

19   who sought '*nunc pro tunc* reinstatement of his visa petition' and granted the injunction, holding

20   that *nunc pro tunc* relief may be available based on the discovery record."  *Id.* Plaintiff contends

21   these cases illustrate that the equitable doctrines of estoppel and *nunc pro tunc* "permit the Court

22   to order the relief Plaintiff seeks in this case."  *Id.*   That relief is warranted, Plaintiff asserts,

23   because "but for Defendants' decision to respond to the Remaining Beneficiaries' application by

24   scheduling them for a further interview in 2024—at least a year after Defendants first learned the

25   Remaining Beneficiaries were married, the asserted ground for refusing their visas now—the

26   Remaining Beneficiaries would not have traveled through a war zone and spent substantial sums

27   of money to attend the 2024 re-interview."  *Id.* (quoting Sinodis Decl. ¶ 2).

28        Plaintiff argues that "[t]he facts of this case that Plaintiff has proffered and will establish

United States District Court
Northern District of California

through discovery are substantially similar to those in *Garcia* and *Torres*." *Id.* at 4. In particular, Plaintiff argues:

> Plaintiff has alleged that embassy officials had a legally binding duty to issue or deny the Remaining Beneficiaries' visas after they attended consular interviews in 2017. Plaintiff further alleges that, acting on orders from Defendants, those embassy officials failed to comply with that duty, and because of foreseeable events resulting from the ensuing delay that were known to Defendants, the Remaining Beneficiaries lost their eligibility for visas. As in *Torres* and *Garcia*, the Court can rectify that injustice by instructing Defendants to adjudicate their visa applications under the facts as they existed in 2017.

*Id.* at 4-5.  Plaintiff argues that Defendants cannot prevail on their mootness argument unless they can show that it is impossible to award any relief – a showing Defendants have not made, according to Plaintiff, because "this Court may grant him relief by ordering *nunc pro tunc* consideration of the Remaining Beneficiaries' visa applications." *Id.* at 5 (citing *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012); *Fikre v. Fed. Bureau of Investigation*, 904 F.3d 1033, 1040 (9th Cir. 2018)).

Plaintiff argues further that he has plausibly alleged all of the elements of equitable estoppel, namely, that Defendants knew the facts that Plaintiff seeks to bar them from invoking and intended that their conduct would be acted on while Plaintiff and his beneficiaries were ignorant of the true facts and detrimentally relied on Defendants' conduct. *Id.* at 3, 5-7. First, he contends, Defendants knew that the Proclamation did not apply to the Remaining Beneficiaries' visas. *Id.* at 5.  According to Plaintiff, Defendants also knew about the Remaining Beneficiaries' marriages "before scheduling the reinterview for their visas in 2024." *Id.* (citing Sinodis Decl. ¶ 5).  Second, Plaintiff argues that Defendants intended that the Remaining Beneficiaries would act on their conduct, namely, scheduling interviews for the Remaining Beneficiaries in 2024 despite having known for years about their marital status[,]" thus "inducing the Remaining Beneficiaries to travel through a war zone at great expense to attend another interview." "*Id.* at 6.  Third, Plaintiff argues that "the Remaining Beneficiaries were unaware of the fact that they would be considered for visas based on their current marital status, given Defendants' conduct in providing visas and allowing every other beneficiary to enter the country upon reinterview." *Id.* Finally,

27

1    Plaintiff contends, "Plaintiff and the Remaining Beneficiaries detrimentally relied on Defendants'

2    conduct by undertaking the expensive, dangerous journey from Yemen to Djibouti for their

3    interviews." *Id.* (citing *Chang*, 327 F.3d at 926; *Department of Homeland Sec. v. Regents of the*

4    *Univ. of California*, 591 U.S. 1, 30 (2020); *Acosta-Olivarria v. Lynch*, 799 F.3d 1271, 1276 (9th

5    Cir. 1976)).

6          Plaintiff rejects Defendants' assertion that there can be no detrimental reliance because a

7    noncitizen visa applicant has no right to a visa. *Id.* at 6-7. This argument "misses the mark[,]"

8    according to Plaintiff, because the test is simply whether "the beneficiaries ' rel[ied] on the

9    [government's] conduct to [their] injury." *Id.* at 6 (quoting *Johnson v. Williford*, 682 F.2d 868,

10   872–73 (9th Cir. 1982)). That test is met here, Plaintiff asserts, based on "the dangerous travel

11   and thousands of dollars in travel expenses and application fees the Remaining Beneficiaries spent

12   to attend their consular interviews[.]" *Id.* at 7.

13         Plaintiff also contends he has adequately alleged that Defendants engaged in affirmative

14   misconduct and that application of equitable estoppel will not unduly harm the public interest. *Id.*

15   at 7-9. Plaintiff argues that he "will be able to show that Defendants' unlawful decision to

16   withhold the already-approved visas, their failure to complete the non-discretionary duty to print

17   the approved visas, and the years of delay before denying the visas in 2024 constitute 'affirmative

18   misconduct' under Ninth Circuit precedent." *Id.* at 7 (citing *Salgado-Diaz*, 395 F.3d at 1165). He

19   points to *Sun Il Yoo v. I.N.S.* as an example, asserting that in that case, "the Ninth Circuit held that

20   INS's delay in acting on a duty was 'the kind of "affirmative misconduct" on the government's

21   part that cannot be employed to penalize an alien who appears to have always acted in good faith.'

22   "  *Id*. (quoting *Sun Il Yoo*, 534 F.2d 1325, 1328–29 (9th Cir. 1976)). Plaintiff also cites *Villena v.*

23   *I.N.S.*, in which the Ninth Circuit held that "a one-year delay in recognizing the validity of a

24   petition for preference classification, where the INS offered no explanation for the delay, was so

25   oppressive as to constitute such affirmative misconduct." *Id.* (quoting *Villena*, 622 F.2d 1352

26   (9th Cir. 1980)). According to Plaintiff, there was no justification for Defendants' delay in issuing

27   their visas after their 2017 approval and in light of their obligation under 9 FAM 504.1-3(i)(1) and

28   22 C.F.R. § 42.81 to "issue or deny a visa," the many years' delay, compounded by Defendants'

28

"decision to schedule the Remaining Beneficiaries for interviews in 2024 after having been aware of their marital status for years, all suggest 'affirmative misconduct.'" *Id.* at 8.

Plaintiff also argues that application of estoppel in this case would not unduly damage the public interest. *Id.* Because this inquiry is highly fact-specific, Plaintiff contends, the Court should reject Defendants' argument that applying estoppel could harm the public's interest in national security. *Id.* According to Plaintiff, there is nothing in the facts of *this* case that suggest any such harm. *Id.* Instead, Plaintiff contends this is a case where "justice and fair play" require the application of equitable estoppel. *Id.* at 8-9 (quoting *Johnson*, 682 F.2d at 871).

Plaintiff argues further that the cases cited by Defendants holding that " 'equitable principles cannot be invoked to compel the government to confer citizenship' [are] entirely irrelevant to Plaintiff's claims and request for equitable estoppel." *Id.* at 9 (citing Defendants' Supp. Brief at 5-6 (citing *I.N.S. v. Hibi*, 414 U.S. 5 (1973); *I.N.S. v. Pangilinan*, 486 U.S. 875 (1988); *Mustanich v. Mukasey*, 518 F.3d 1084 (9th Cir. 2008))). According to Plaintiff, unlike those cases, he does not ask the court to issue an order that requires Defendants to confer citizenship status on the remaining beneficiaries, or even "to confer *any* immigration status on the Remaining Beneficiaries." *Id.* Rather, he "seeks an order for Defendants to consider the facts as they existed in 2017 and before Defendants' wrongful delay to reach a decision on the beneficiaries' immigration status." *Id.* He argues that "[t]his kind of relief is well within the court's authority under the doctrine of nunc pro tunc." *Id.* (citing *Torres*, 229 F.3d 1159; *Garcia*, 2021 WL 4815945).

Plaintiff also argues that Defendants ignore the fact that the Remaining Beneficiaries' visas were approved in 2017 and therefore, Defendants' argument that Plaintiff cannot claim estoppel because the Remaining Beneficiaries had no right to a visa fails. *Id.* at 9-10. According to Plaintiff, he "does not claim that the Remaining Beneficiaries have a general right to a visa, only a right to the printing of a visa that has already been fully adjudicated and issued." *Id.* at 10. Because the cases Defendants cite did not involve "already-approved visa applications" they are not on point, Plaintiff asserts. *Id.* (distinguishing *Khachatryan v. Blinken*, 4 F.4th 841, 848 (9th Cir. 2021); *Kerry v. Din*, 576 U.S. 86, 89–90 (2015); *Chheng v. U.S. Dep't of Homeland Sec.*, No.

21-cv-03223-JSC, 2021 WL 5233186, at *1, *4 (N.D. Cal. Nov. 10, 2021), aff'd, No. 21-17040, 2023 WL 5665763 (9th Cir. Sept. 1, 2023)). Likewise, Plaintiff argues, Defendants' reliance on *Hibi*, *Pangilinan* and *Mustanich* is misplaced because none of those cases "concerned a plaintiff who was eligible to receive a visa at the time they applied, let alone a plaintiff who was approved for a visa." *Id.*

Plaintiff rejects Defendants' "policy-based argument" invoking a "hypothetical threat" to national security, arguing that the "hypothetical fail[s] to engage in any way with the facts of this case" and moreover, "no individual would commit an act of terrorism in reliance on Defendants' conduct or delay, so there is no possibility for the prongs of estoppel to be met" under Defendants' scenario. *Id.* at 11.

Finally, Plaintiff argues that the doctrine pf consular nonreviewability does not apply because "[a]n order to adjudicate the remaining beneficiaries' visa application under the facts that existed in 2017 does not require the Court to review the merits of any discretionary decision already made by a consular officer." *Id.*

## III.    ANALYSIS

### A.    Legal Standards

#### 1.    Rule 12(b)(6)

A complaint may be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim on which relief can be granted. "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). Generally, a plaintiff's burden at the pleading stage is relatively light. Rule 8(a) of the Federal Rules of Civil Procedure states that a "pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).

In ruling on a motion to dismiss under Rule 12(b)(6), the court analyzes the complaint and takes "all allegations of material fact as true and construe[s] them in the light most favorable to the non-moving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). A complaint must "contain either direct or inferential allegations respecting all the material elements

30

necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). Rather, the claim must be "'plausible on its face,'" meaning that the plaintiff must plead sufficient factual allegations to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 570).

### 2. Rule 12(b)(1)

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, a district court must dismiss an action if it lacks jurisdiction over the subject matter of the suit. *See* Fed. R. Civ. P. 12(b)(1). "Subject matter jurisdiction can never be forfeited or waived and federal courts have a continuing independent obligation to determine whether subject-matter jurisdiction exists." *Leeson v. Transamerica Disability Income Plan*, 671 F.3d 969, 975 n.12 (9th Cir. 2012) (internal quotation marks and citations omitted). On a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), it is the plaintiff's burden to establish the existence of subject matter jurisdiction. *Kingman Reef Atoll Invs., LLC v. United States*, 541 F.3d 1189, 1197 (9th Cir. 2008).

A party challenging the court's subject matter jurisdiction under Rule 12(b)(1) may bring a facial challenge or a factual challenge. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). "'In deciding a Rule 12(b)(1) facial attack motion, a court must assume the facts alleged in the complaint to be true and construe them in the light most favorable to the nonmoving party.'" *Torrey Pines Logic, Inc. v. Gunwerks, LLC*, No. 19-CV-02195-H-JLB, 2020 WL 6106814, at *4 (S.D. Cal. July 14, 2020) (quoting *Strojnik v. Kapalua Land Co. Ltd.*, 379 F. Supp. 3d 1078, 1082 (D. Haw. 2019) (citing *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003))). In contrast, a factual challenge to subject matter jurisdiction "disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.* (citing *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)).

United States District Court
Northern District of California

"In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Safe Air for Everyone*, 373 F.3d at 1039 (citing *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n. 2 (9th Cir.2003) (internal citation omitted)). Furthermore, the court is not required to presume the truthfulness of the plaintiff's allegations in addressing a factual attack. *Id.* (citing *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000)). "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cnty.*, 343 F.3d 1036, 1039 n. 2 (9th Cir. 2003).

### 3. Rule 12(b)(3)

A party may bring a motion to dismiss an action for improper venue pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure. When venue is improper, the court "shall dismiss, or if it be in the interest of justice, transfer such a case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). The plaintiff bears the burden of showing that venue is proper. *See Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979). On a motion to dismiss under Rule 12(b)(3), "the pleadings need not be accepted as true, and the court may consider facts outside of the pleadings." *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1137 (9th Cir. 2004) (citations omitted). However, the court "is obligated to draw all reasonable inferences in favor of the non-moving party and resolve all factual conflicts in favor of the non-moving party." *Id*. at 1138.

### B.    Request for Judicial Notice

Defendants ask the Court to take judicial notice of the CEAC database entries reflecting that the Remaining Beneficiaries' visa applications were refused at their August 4, 2024 consular interview at the U.S. Embassy in Djibouti. Because Plaintiffs admitted at the motion hearing that the Remaining Beneficiaries' visa applications were, in fact, refused at that interview, the Court need not reach whether the information in the CEAC database is subject to judicial notice.

Defendants also ask to the Court to take judicial notice of the information contained in the

United States District Court
Northern District of California

United States District Court
Northern District of California

Paterson and Hines Declarations, citing *Algzaly v. Blinken*, No. 20-cv-03322-JCS, 2021 WL 2531052, (N.D. Cal. Jun. 21, 2021). In that case, the undersigned found that a declaration by a State Department attorney-advisor was "a public record subject to judicial notice." 2021 WL 2531052, at * 10. *Algzaly* does not support Defendants' position, however. In that case, the issue was whether the defendants had met their obligation to inform the visa applicant of the statutory basis for denying their application. *Id.* The Court found that the while the consular officer may not have provided this information at the time of the denial, any defect as to notice was cured by the declarations of the State Department attorney-advisor, which provided notice to the visa applicant of the statutory basis for the denial. *Id.* The Court took judicial notice, then, only of the *existence* of a declaration from the State Department explaining the reasons for the denial. It did not take judicial notice of the *truth* of any particular statement in the declaration, as Defendants ask the Court to do here.

Furthermore, judicial notice under Rule 201 of the Federal Rules of Evidence is only appropriate where a fact is "not subject to reasonable dispute." F.R.Evid. 201(b). This requirement is met where a fact "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." F.R.Evid. 201(b)(2). Paterson and Hines provide information they obtained from the CCD, but at least one fact they have offered (and one which is critical to Plaintiffs' theory of the case) is contradicted by evidence presented by the Remaining Beneficiaries. In particular, while Paterson states that the consular officer refused the visa application of Mohamed Abdo Ali Mohamed at the July 5, 2017 visa interview, Second Paterson Decl. ¶ 5, Plaintiff has alleged that he was given a written notice at that interview stating, "Your visa is approved." Compl. ¶ 160 & Ex. 19. That notice is attached to the complaint as an exhibit and Defendants conceded at the motion hearing that they do not question its authenticity even though it appears to conflict with the information Paterson says she found in the CCD. Moreover, Defendants' counsel was unable to provide an explanation for the discrepancy at the hearing. Under these circumstances, Defendants have not established that the facts contained in the Paterson and Hines Declarations "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Therefore, the Court DENIES Defendants' request

1  that the Court take judicial notice of the facts contained in those declarations.[3]

2

### C. Whether Venue is Proper in this District

3     In the Complaint, Plaintiff claims that venue in this district is proper pursuant to 28 U.S.C.

4  section 1391(e)(1) because one or more of the Plaintiffs reside in this judicial district.  Compl. ¶

5  25. Defendants acknowledge that two of the original Plaintiffs, Hanna Dobashi and Hajer Taleb,

6  allegedly reside in Oakland, CA, which is within this judicial district.  Compl. ¶ 48.  Moreover, the

7  Declaration of Courtney Paterson filed by Defendants in connection with their initial motion to

8  dismiss, dkt. no. 49-1, reflects that Dobashi's family member was not granted a visa until October

9  15, 2019, *after* the complaint in this case was filed.  Dkt. no. 49-1 ¶ 5.[4] Defendants contend,

10  however, that venue is not proper in this district because the two Plaintiffs who resided here were

11  dismissed before a responsive pleading was filed in this case.  The Court rejects Defendants'

12  argument.

13     It is well established that venue under Section 1391(e) is determined "at the time of the

14  suit."  *Stafford v. Briggs*, 444 U.S. 527, 536 (1980).   Defendants have cited no authority to

15  support their assertion that it is "apparently" irrelevant to venue that two of the original plaintiffs

16  resided in this district when the action was filed.  Reply at 12.  Nor do they cite a single case in

17  support of their assertion that Plaintiff's "theory of eternally proper venue" is incorrect.  *See id.*

18  The Court therefore finds that venue in this district is proper.

19

### D. Whether Plaintiff States a Fifth Amendment Due Process Claim

20     Plaintiff asserts that Defendants' "failure to print and place Plaintiff's Beneficiaries'

21  approved visas in their passports, and Defendants' subsequent unlawful and erroneous decision to

22  revoke the visas, in violation of the Proclamation's plain terms, deprived Plaintiff of a property

23  interest without the protections of due process."  Opposition at 12; *see also*  Compl. ¶ 242

---

[3] As discussed above, however, the Court can consider evidence to the extent that Defendants have brought a factual challenge to Plaintiffs' claims under Rule 12(b)(1).

[4] Paterson states that Taleb's beneficiary was granted a visa on September 1, 2019, a few days before the complaint in this case was filed.  Dkt. no. 49-1 ¶ 6. Because of the phrasing of the Paterson Declaration, it is unclear if Dobashi and Taleb's family members' visas were actually issued on October 15, 2019 and September 1, 2019, respectively, or if this was the date on which the consular officer found that their family members were eligible for a waiver of the entry restrictions under the Proclamation.

34

1   (alleging that Plaintiff has "constitutionally protected liberty interests in family reunification.").

2   Defendants assert that under *Dep't of State v. Muñoz*, 602 U.S. 899 (2024), Plaintiff has no due

3   process rights as to the Remaining Beneficiaries' visa applications and therefore, Plaintiff fails to

4   state a claim under Rule 12(b)(6).  They also contend the due process claim is barred by the

5   doctrine of consular nonreviewability.   The Court concludes Defendants are correct on the former

6   question and therefore does not reach the question of whether consular nonreviewability also bars

7   Plaintiff's due process claim.

8        In *Muñoz*, the plaintiff, Sandra Muñoz, was an American citizen who had filed an I-130

9   petition with respect to her husband, Luis Asencio-Cordero, a citizen of El Salvador, seeking to

10  have him classified as an immediate relative.  602 U.S. at 905.  That petition was granted.  *Id.*

11  Asencio-Cordero then filed a visa application in El Salvador, which was denied under 8 U.S.C. §

12  1182(a)(3)(A)(ii), which renders inadmissible a noncitizen who the officer "knows, or has

13  reasonable ground to believe, seeks to enter the United States to engage solely, principally, or

14  incidentally in" certain specified offenses or "any other unlawful activity." *Id*.  No further

15  information was provided, but Asencio-Cordero guessed, correctly, that the consular officer had

16  concluded on the basis of his tattoos that he was a member of the MS-13 gang and he appealed the

17  decision to the State Department with evidence that the tattoos were innocent.  *Id.* The State

18  Department affirmed the decision of the consular officer, however, and so Muñoz and her husband

19  sued the State Department and the consular officer in El Salvador, asserting, *inter alia*, that "the

20  State Department had abridged Muñoz's constitutional liberty interest in her husband's visa

21  application by failing to give a sufficient reason why Asencio-Cordero [was] inadmissible under

22  the 'unlawful activity' bar."  *Id.* at 906.

23       The Supreme Court "assumed that a narrow exception to [the doctrine of consular

24  nonreviewability] exists 'when the denial of a visa allegedly burdens the constitutional rights of a

25  U. S. citizen.'" *Id.* at 908 (quoting *Trump v. Hawaii*, 585 U.S. 667, 703 (2018)).  It found,

26  however, that Muñoz did not have a right to due process with respect to her husband's visa

27  application, noting that "[w]hile 'families of putative immigrants  certainly have an interest in

28  their admission,' it is a 'fallacy' to leap from that premise to the conclusion that United States

*United States District Court*
*Northern District of California*

citizens have a 'fundamental right' that can limit how Congress exercises 'the Nation's sovereign power to admit or exclude foreigners.'" *Id.* (quoting *Fiallo v. Bell*, 430 U.S. 787, 795 n. 6 (1977)).

The Court went on to speak even more broadly, suggesting that no one can assert their own due process rights were infringed based on something that occurred in another person's legal proceedings:

> Muñoz's claim to a procedural due process right in someone else's legal proceeding would have unsettling collateral consequences. Consider where her logic leads: Could a wife challenge her husband's "assignment to a remote prison or to an overseas military deployment, even though prisoners and service members themselves cannot bring such challenges"? . . . Could a citizen assert procedural rights in the removal proceeding of her spouse? . . . Muñoz's position would usher in a new strain of constitutional law, for the Constitution does not ordinarily prevent the government from taking actions that "indirectly or incidentally" burden a citizen's legal rights.

*Id.* at 916-917 (citations omitted).

Here, Plaintiff's due process claim is based on the right not to be deprived of his "liberty interest in family reunification" without due process. Compl. ¶ 243. Yet the *Muñoz* Court held that U.S. citizens generally do not have such a right. The reasoning in *Muñoz* further undercuts Plaintiff's claim given that he seeks to enforce statutory and regulatory requirements related to the issuance of visas in someone else's legal proceedings, namely, the proceedings relating to the Remaining Beneficiaries' visa application.

Plaintiff attempts to distinguish *Muñoz* on the basis that the consular officer here *approved* the visas of the Remaining Beneficiaries in 2017, giving rise to a property interest that did not exist in *Muñoz*. Opposition at 12. But Plaintiff has not pointed to any authority to support this argument and does not offer a persuasive justification for concluding that any property interest that might have arisen as a result of the approval accrued to Plaintiff, as opposed to the beneficiaries whose visa application process is being challenged. The reasoning of *Muñoz* points to the opposite conclusion.

The Court also is not persuaded by Plaintiff's attempt to distinguish the facts here from those in *Muñoz* based on *Ching*. In *Ching*, which was decided before *Muñoz*, the Ninth Circuit held that "[i]mmediate relative status for an alien spouse is a right to which citizen applicants are

entitled as long as the petitioner and spouse beneficiary meet the statutory and regulatory requirements for eligibility." 725 F.3d at 1156. In other words, "[t]he decision of whether to approve an I–130 visa petition is a nondiscretionary one because 'determinations that 'require application of law to factual determinations' are nondiscretionary.' " *Id.* at 1155 (quoting *Hernandez v. Ashcroft*, 345 F.3d 824, 833–34 (9th Cir. 2003) (internal alteration omitted)). Because "[i]mmediate relative status for an alien spouse is a right to which citizen applicants are entitled as long as the petitioner and spouse beneficiary meet the statutory and regulatory requirements for eligibility[,] [t]his protected interest is entitled to the protections of due process." *Id.* at 1156. Here, however, Plaintiff's due process claim is not based on an infringement of his rights with respect to his I–130 petition, which was granted. Rather, his claim is based on the denial of his beneficiaries' visa applications, placing the claim within the ambit of *Muñoz*.[5]

For the reasons stated above, the Court concludes that Plaintiff fails to state a claim for violation of his Fifth Amendment due process rights. Therefore, Plaintiff's Fifth Amendment Due Process claim is dismissed with prejudice.

### E.    Whether Doctrine of Consular Nonreviewability Bars Plaintiff's APA Claim

#### 1.    Legal Standards

The Supreme Court has "recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Dep't of State v. Muñoz*, 602 U.S. at 907 (quoting *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (internal quotation omitted)). Thus, "Congress may delegate to executive officials the discretionary authority to admit noncitizens 'immune from judicial inquiry or interference.'" *Id.* at 907-908 (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–591 (1952)). Where there has been such a delegation, the action of an executive officer to admit or to exclude an alien is final and conclusive. *Id.* at 908 (citations omitted).

---

[5] Although there is language in *Ching* that appears to run counter to the reasoning of *Muñoz*, at least one judge has found that *Ching* and *Muñoz* are not clearly irreconcilable and therefore, that *Ching* has not been overruled. *See Hanan v. U.S. Citizenship & Immigr. Servs.*, No. 23-CV-02414-HSG, 2024 WL 4293917, at *12 (N.D. Cal. Sept. 25, 2024). The Court need not decide that question because if finds that *Ching* does not apply to the facts here.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    The INA confers upon consular officers exclusive authority to grant, deny, or revoke

2    immigrant and non-immigrant visas, "precluding even the Secretary of State from controlling their

3    determinations." *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1156–57 (D.C. Cir. 1999) (citing 8

4    U.S.C. §§ 1104(a), 1201(a), (i)). "[T]hus, as a rule, the federal courts cannot review those

5    decisions." *Dep't of State v. Muñoz*, 602 U.S. at 908. "This principle is known as the doctrine of

6    consular nonreviewability." *Id.* The doctrine of consular nonreviewability protects only the

7    "discretionary visa-processing [] authority [of] a consular officer" from judicial review. *Allen v.*

8    *Milas*, 896 F.3d 1094, 1105 (9th Cir. 2018) (citing *Kleindienst v. Mandel*, 408 U.S. 753 (1972)).

9    It does not apply to acts as to which the consular officer had no authority whatsoever. *Id.* at 1108

10   & n. 4 (discussing *Wong v. Department of State*, 789 F.2d 1380 (9th Cir. 1986); *Patel v. Reno*, 134

11   F.3d 929 (9th Cir. 1997)).

12   For example, in *Patel v. Reno*, the Ninth Circuit held that the doctrine did not apply where

13   the plaintiffs sought mandamus relief to compel the consulate in Mumbai, India to make a

14   decision on their visa application, which had been pending for eight years. 134 F.3d at 930. In

15   that case, the I-130 petitioner, Mohanbhai Patel ("Patel"), was a naturalized U.S. citizen who had

16   obtained this status based on marriage to a United States citizen, Judy Brewington, in 1982. *Id.* at

17   930-931. He sought a visa for his wife Jyotika Patel ("Jyotika"), who he claimed to have married

18   in 1988, and her two children. *Id.* When the consulate investigated, it found that Patel may have

19   already been married to Jyotika when he purportedly married Brewington and therefore, that his

20   marriage to Brewington was invalid for purposes of naturalization. *Id.* at 931. The consulate

21   therefore "forwarded the visa petitions back to the INS for further action to be taken against

22   Patel." *Id.* When the Patels brought a mandamus action, the INS agreed to forward the

23   application back to the consulate in return for dismissal of the claim without prejudice. *Id.* The

24   INS did so, but it also informed the consulate (incorrectly), that denaturalization proceedings had

25   been brought against Patel. *Id.* Consequently, the consulate did not issue the visas. *Id.* When the

26   Patel's attorney contacted the consulate to inquire about the status of the visa, the consulate

27   "responded with a letter which explained that the INS told them that denaturalization proceedings

28   had begun against Patel and thus 'the application is refused' until the denaturalization proceedings

United States District Court
Northern District of California

38

had been completed and Patel's eligibility to petition had been firmly established." *Id.* At that point, the Patel's reopened their mandamus action, adding the U.S. consulate in Mumbai and its chief counsel. *Id.*

The court in *Patel* found that the mandamus relief sought by the Patels was not barred under the doctrine of consular nonreviewability, explaining:

> Normally a consular official's discretionary decision to grant or deny a visa petition is not subject to judicial review. *Li Hing of Hong Kong, Inc. v. Levin*, 800 F.2d 970, 971 (9th Cir.1986); *Ventura–Escamilla v. INS*, 647 F.2d 28, 30 (9th Cir.1981). However, when the suit challenges the authority of the consul to take or fail to take an action as opposed to a decision taken within the consul's discretion, jurisdiction exists. *See Mulligan v. Schultz*, 848 F.2d 655, 657 (5th Cir.1988) (judicial review is appropriate to consider a challenge to the Secretary's authority to place temporal limits on processing non-preference visa applications).
>
> The Patels are challenging the consul's authority to suspend their visa applications, not challenging a decision within the discretion of the consul. Therefore, jurisdiction exists to consider whether the consulate has the authority to suspend the visa applications.

*Id.* at 931-932.

The court went on to explain that the Patel's claim was based on a non-discretionary duty because "[a] consular office is required by law to act on visa applications." *Id.* at 932 (citing 22 C.F.R. § 42.81). The court observed, "[u]nder 22 C.F.R. § 42.81, '[w]hen a visa application has been properly completed and executed before a consular officer in accordance with the provision of INA and the implementing regulations, the consular officer shall either issue or refuse the visa. Every refusal shall be in conformance with the provisions of 22 C.F.R. 40.6.'" *Id.* Because the refusal letter sent by the consulate did not comport with the regulations governing visa refusals, the court found that it was not a "refusal" within the meaning of the INA's implementing regulations. *Id.* The court therefore found that a writ of mandamus compelling the consulate to act on the Patel's visa application should issue. *Id.* On the other hand, it granted summary judgment in favor of the remaining defendants (the Attorney General, the Secretary of State, the INS and its director) on the ground that they had no authority to issue visas. *Id.* at 933. In doing so, the court rejected the Patel's argument that mandamus relief prohibiting these defendants from interfering with the consulate's issuance of their visa was available, reasoning that "such relief

39

1    does not involve a nondiscretionary, ministerial duty, as required before a writ of mandamus can

2    issue." *Id.* (citation omitted).

3        **2. Discussion**

4        In the Complaint, Plaintiff brought his APA claim under 5 U.S.C. § 706(2), seeking review

5    of a "final agency action" namely, Defendants' alleged revocation of the beneficiaries' previously

6    approved immigrant visas under the Proclamation.    Compl. ¶¶ 224-227. Plaintiff asked the Court

7    to "[e]njoin Defendants . . . from implementing or enforcing any portion of Section 3(c) of the

8    Proclamation in a manner that violates the APA . . .  [and] [m]andate that Defendants issue

9    Plaintiffs' Beneficiaries' previously approved immigrant visas." *Id.*  ¶¶ 254-255. The first part of

10   Plaintiff's requested remedy became moot when the Proclamation was revoked, in 2021.

11   However, Plaintiff asserts that his APA claim survives because Defendants have a duty to issue

12   the Remaining Beneficiaries' visas based on the approval notice they were given following their

13   interview in July 2017.  According to Plaintiff, this duty is mandatory and non-discretionary and

14   therefore it is not subject to the doctrine of consular nonreviewability.

15       In support of Plaintiff's assertion that Defendants have a mandatory duty to print the visas

16   of the Remaining Beneficiaries, Plaintiff points to 22 C.F.R. § 42.81(a).  As applicable here, that

17   regulation requires that when a "visa application has been properly completed and executed . . .

18   the consular officer must issue the visa [or] refuse the visa under [8 U.S.C. § 1182, § 1201(g),] or

19   other applicable law[.]"  But this regulation merely gives rise to a non-discretionary duty to *act* on

20   a visa application by either issuing the visa or denying it.  *See Patel*, 134 F.3d at 932 ("A consular

21   office is required by law to act on visa applications."). Plaintiff has not pointed to any provision of

22   the INA or its implementing regulations that establishes a non-discretionary duty to "print" a visa

23   after having informed the applicant that their visa was approved.  Nor has Plaintiff cited any case

24   authority that suggests that a notice of approval such as the one received by the Remaining

25   Beneficiaries deprives the consular officer of discretion with respect to whether the visa will,

26   ultimately, be issued or denied.    Because the consular officer has discretion with respect to both

27   the issuance of visas and revocation of visas, the Court concludes that Plaintiff's APA claim based

28   on the refusal of the Remaining Beneficiaries' visa applications in January 2018, whether

United States District Court
Northern District of California

40

1    characterized as a denial or a revocation, falls under the doctrine of consular nonreviewability.

2        The cases Plaintiff cites in support of his assertion that Defendants had a mandatory, non-

3    discretionary duty to print the Remaining Beneficiaries' visas and that he is "simply requesting

4    that Defendants follow their own processes[,]" *see* Opposition at 11-12, are not on point because

5    they involved non-discretionary duties that were explicitly established under the regulations. In

6    *Rivas v. Napolitano*, for example, the court found that the doctrine of consular nonreviewability

7    did not apply where the plaintiff had sought reconsideration of a visa denial and the defendants

8    took no action on the request. 714 F.3d at 1111. The court found that the claim involved a non-

9    discretionary duty to act under 22 C.F.R. § 42.81(e), which provides that where there is a timely

10   request for reconsideration, "the case *shall* be reconsidered." *Id.*

11       Similarly, in *Atiffi v. Kerry*, the court found that the plaintiff stated a valid APA claim

12   based on the consular officer's failure to provide reasons for the denial of her visa in the denial

13   letter, in violation of 22 C.F.R. § 42.81(b), which "imposed on the consular officer 'a

14   nondiscretionary, ministerial duty' to inform [the plaintiff] of the statutory and/or regulatory basis

15   for the visa refusal." 2013 WL 5954818, at *8 (E.D. Cal. Nov. 6, 2013). And in *Hernandez*

16   *Castro v. Mayorkas*, the court found that an APA claim was not barred by the doctrine of consular

17   nonreviewability where a visa application was denied on the basis of medical ineligibility because

18   the panel doctor retained by the consulate to examine the applicant had a non-discretionary duty

19   under the applicable regulations to consider whether the applicant qualified for a vaccine waiver

20   and had not done so. No. 2:21-CV-00315-SAB, 2022 WL 1085682, at *1 (E.D. Wash. Apr. 11,

21   2022).

22       The only non-discretionary duty Plaintiff has identified in connection with the Remaining

23   Beneficiaries' visa applications is the duty to issue their visas or deny their applications. That

24   duty is expressly set forth in 22 C.F.R. § 42.81(a) and under *Patel*, it is mandatory; therefore an

25   APA claim seeking to compel Defendants to perform this duty would not be barred under the

26   doctrine of consular nonreviewability. At this point, however, it is undisputed that the consular

27   officer reinterviewed the Remaining Beneficiaries in August 2024 and denied their applications.

28   Therefore, Plaintiff cannot base his APA claim on inaction with respect to the mandatory duty to

United States District Court
Northern District of California

1    issue or deny the Remaining Beneficiaries' visa applications.  As discussed below, the Court also

2    concludes that it does not have authority to afford equitable relief on Plaintiff's APA claim.

3    **F.    Whether the Court Has Jurisdiction over the Mandamus Act Claim**

4        The Mandamus Act, 28 U.S.C. § 1361, vests district courts with "original jurisdiction over

5    any action in the nature of mandamus to compel an officer or employee of the United States or any

6    agency thereof to perform a duty owed to the plaintiff." In the Mandamus Act claim, Plaintiff asks

7    the Court to order Defendants to perform their "clear, non-discretionary duties . . . to properly and

8    in good faith, timely complete the printing of Plaintiffs' Beneficiaries' approved visas as is

9    required by the INA and applicable regulations." Compl. ¶ 248. As discussed above, however,

10   Plaintiff has not established that Defendants have a mandatory, nondiscretionary duty to print the

11   Remaining Beneficiaries' visas.  Instead, the relevant statute and regulations require Defendants to

12   *adjudicate* their visa application.  Because the visa applications were denied in August 2024,

13   "there is no outstanding duty the court could compel Defendants to perform and no remaining

14   relief [Plaintiff] can obtain under the Mandamus Act" with respect to the Remaining

15   Beneficiaries' visa applications.  *Akimenko v. Mayorkas*, No. 21-CV-03738-DMR, 2022 WL

16   1539519, at *3 (N.D. Cal. May 16, 2022).  As discussed below, the Court further finds that the

17   equitable relief that would allow Plaintiff to avoid this result is not available under the facts of this

18   case.

19   **G.    Mootness and the Availability of Equitable Relief**

20       Plaintiff contends his APA and Mandamus Act claims do not run afoul of the doctrine of

21   consular nonreviewability and are not moot because the Court can exercise its equitable powers to

22   order the consular officer to consider the visa applications of the Remaining Beneficiaries, *nunc*

23   *pro tunc,* as of the time the Remaining Beneficiaries' visas were approved in July 2017 (when they

24   were not yet married and therefore were not barred from obtaining child derivative visas on that

25   basis) under the doctrine of equitable estoppel.  For the reasons set forth below, the Court

26   concludes that such relief is not available under the specific facts of this case.

27   **1.  Legal Standards**

28       "The government in immigration cases may be subject to equitable estoppel if it has

42

engaged in affirmative misconduct." *Salgado-Diaz v. Gonzales*, 395 F.3d 1158, 1165 (9th Cir.

2005), as amended (Mar. 10, 2005), opinion amended on reconsideration, No. 02-74187, 2005 WL

553046 (9th Cir. Mar. 10, 2005) (citations omitted).  The Ninth Circuit has explained:

> In this circuit, estoppel traditionally is available against a
> nongovernment party who has made a knowing false representation
> or concealment of material facts to a party ignorant of the facts, with
> the intention that the other party should rely on it, where the other
> party actually and detrimentally relies on it. *See Jaa v. INS*, 779 F.2d
> 569, 571 (9th Cir.1986). A party asserting estoppel against the federal
> government bears additional burdens. First, "estoppel against the
> government must rest on affirmative misconduct going beyond mere
> negligence." *Morgan v. Heckler*, 779 F.2d 544, 545 (9th Cir.1985);
> *see Jaa*, 779 F.2d at 572.1 "Furthermore, estoppel will apply only
> where the government's wrongful act will cause a serious injustice,
> and the public's interest will not suffer undue damage by imposition
> of the liability." *Morgan*, 779 F.2d at 545; *see Jaa*, 779 F.2d at 572.

*Mukherjee v. I.N.S.*, 793 F.2d 1006, 1008–09 (9th Cir. 1986). In addition, a party seeking to

invoke equitable estoppel against the government must establish the traditional elements of

equitable estoppel, "which require a showing that (1) the party to be estopped knows the facts; (2)

the party intends that his or her conduct will be acted on; (3) the claimant must be ignorant of the

true facts; (4) and the claimant must detrimentally rely on the other party's conduct." *Salgado-*

*Diaz*, 395 F.3d at 1166 (citing *Johnson v. Williford*, 682 F.2d 868, 872 (9th Cir. 1982)).

Below, the Court reviews the key cases the parties have relied upon in their supplemental

briefs addressing the availability of equitable relief in this case.

### a.  *Hibi*, *Pangilinan* and *Mustanich*

Defendants contend that under *Hibi* and *Pangilinan*, the Supreme Court has established

"the rule that equitable principles cannot apply to confer citizenship, regardless of the

government's actions or a plaintiff's reliance thereon."  Defendants' Supp. Brief at 6.  According

to Defendants, that rule was applied by the Ninth Circuit in *Mustanich*.

In *Hibi*, the petitioner (Marciano Hibi) was born in the Phillippines in 1917 and fought in

World Word II in a unit of the United States Army, from which he was discharged in December

1945.  414 U.S. at 5-6.  In 1942, Congress had amended the Nationality Act of 1940 to provide for

the naturalization of noncitizens who served honorably in the Armed Forces of the United States

during World War II and authorized the appointment of "naturalization officers to confer these

benefits on noncitizens outside the jurisdiction of a naturalization court." *Id.* at 6-7, 9. All petitions under the amended law had to be filed prior to discharge from the armed forces and no later than December 31, 1946. *Id*. at 7. According to the dissent, the record reflected that "[b]etween 1943 and 1946, these officers traveled from post to post, through England, Iceland, North Africa, and the islands of the Pacific, naturalizing thousands of foreign nationals pursuant to the mandate of Congress." *Id.* at 10. However, for a significant portion of this period, no naturalization officer was posted in the Phillippines. *Id.*

Hibi did not apply for naturalization until 1964, when he entered the United States on a visitor-for-business visa. *Id.* at *7. Hibi argued that the "Government was estopped from relying on the statutory time limit which Congress had attached to the provisions under which he claimed" a right to citizenship, citing the Government's "failure to advise him, during the time he was eligible, of his right to apply for naturalization, and [its] failure to provide a naturalization representative in the Philippines during all of the time [Hibi] and those in his class were eligible for naturalization." *Id.* at *7-8. The lower courts agreed, but the Supreme Court rejected Hibi's estoppel argument, observing that it was "well settled that the Government is not in a position identical to that of a private litigant with respect to its enforcement of laws enacted by Congress." *Id.* at *8. It went on to cite the "general rule" that " 'laches or neglect of duty on the part of officers of the Government is no defense to a suit by it to enforce a public right or protect a public interest. . . . A suit by the United States to enforce and maintain its policy respecting lands which it holds in trust for all the people stands upon a different plane in this and some other respects from the ordinary private suit to regain the title to real property or to remove a cloud from it.'" *Id.* (quoting *Utah Power & Light Co. v. United States*, 243 U.S. 389, 409 (1917)). Because the Government was "enforcing the cutoff date established by Congress" and therefore "enforcing the public policy established by Congress[,]" the Court concluded the 1946 deadline was enforceable and that Hibi's application was therefore barred. *Id.*

The Court in *Hibi* acknowledged that "the issue of whether 'affirmative misconduct' on the part of the Government might estop it from denying citizenship was left open" in *Montana v. Kennedy*, 366 U.S. 308, 314, 315 (1961), but found that "no conduct of the sort there adverted to

44

was involved" in *Hibi*.  *Id.*  The Court explained, "[w]e do not think that the failure to fully publicize the rights which Congress accorded under the Act of 1940, or the failure to have stationed in the Philippine Islands during all of the time those rights were available an authorized naturalization representative, can give rise to an estoppel against the Government." *Id.* at 8-9.

The dissent disagreed with this conclusion, highlighting the findings of the lower courts that in September 1945, the U.S. government had revoked the authority of the U.S. vice-counsel in the Philippines to conduct naturalizations in response to concerns expressed by the Philippine government about men leaving the Philippines and depleting the work force there; as a result, Hibi had no way to apply for naturalization prior to discharge as there was no authorized naturalization representative  in the Philippines at the time he would have been eligible to apply.  *Id.* at *11. The dissent found that the "deliberate—and successful—effort on the part of agents of the Executive Branch to frustrate the congressional purpose and to deny substantive rights to Filipinos such as respondent by administrative fiat" met the affirmative misconduct requirement to apply estoppel against the government.  *Id.*

*Pangilinan* involved the same December 1946 cut-off date to the Nationality Act of 1940 and was brought by 16 Filipino nationals who, like Hibi, served with the United States Armed Forces during World War II and applied for naturalization many years after the cut-off.  486 U.S. at 880-882.  It was undisputed that all of the plaintiffs would have been eligible for naturalization had they applied for naturalization before the cut-off.  *Id.* at 880.  The Court recounted the same events described by the dissent in *Hibi*, which left the Philippines without any authorized naturalization officer from October 1945 until August 1946 and led to a "stream of litigation involving efforts by Filipino veterans to obtain naturalization under the expired 1940 Act."  486 U.S. at 877-881.   According to the Court, the Ninth Circuit found that its "equitable authority to craft a remedy enable[d] the conferral of citizenship despite that cutoff[,]" a conclusion the Court rejected as in conflict with *Hibi*.  *Id.*at 883.

The Court explained:

> The reason we expressed why estoppel could not be applied, viz., that
> that doctrine could not override a "public policy established by
> Congress," surely applies as well to the invocation of equitable

United States District Court
Northern District of California

> remedies. Even assuming the truth of the Ninth Circuit's unsupported assertion that "[i]n reviewing naturalization petitions, federal courts sit as courts of equity," 796 F.2d, at 1102, it is well established that "[c]ourts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law." *Hedges v. Dixon County*, 150 U.S. 182, 192, 14 S.Ct. 71, 74-75, 37 L.Ed. 1044 (1893). "A Court of equity cannot, by avowing that there is a right but no remedy known to the law, create a remedy in violation of law...." *Rees v. Watertown*, 86 U.S. [19 Wall.] 107, 122, 22 L.Ed. 72 (1874). See also, e.g., *Thompson v. Allen County*, 115 U.S. 550, 555, 6 S.Ct. 140, 142, 29 L.Ed. 472 (1885); 1 J. Story, Equity Jurisprudence § 19 (W. Lyon ed. 1918).
>
> More fundamentally, however, the power to make someone a citizen of the United States has not been conferred upon the federal courts, like mandamus or injunction, as one of their generally applicable equitable powers. *See, e.g.*, 28 U.S.C. § 1361; 28 U.S.C. § 1651. Rather, it has been given them as a specific function to be performed in strict compliance with the terms of an authorizing statute which says that "[a] person may be naturalized ... in the manner and under the conditions prescribed in this subchapter, and not otherwise." 8 U.S.C. § 1421(d) (emphasis added).
>
> "An alien who seeks political rights as a member of this Nation can rightfully obtain them only upon terms and conditions specified by Congress. Courts are without authority to sanction changes or modifications; their duty is rigidly to enforce the legislative will in respect of a matter so vital to the public welfare." *United States v. Ginsberg*, 243 U.S. 472, 474, 37 S.Ct. 422, 425, 61 L.Ed. 853 (1917). Or as we have more recently said: " 'Once it has been determined that a person does not qualify for citizenship, ... the district court has no discretion to ignore the defect and grant citizenship.' " *Fedorenko v. United States*, 449 U.S. 490, 517, 101 S.Ct. 737, 752-753, 66 L.Ed.2d 686 (1981) (citation omitted).

*Id.* at 883-84. The Court concluded that Congress's intent with respect to the cut-off was manifest and held that "[n]either by application of the doctrine of estoppel, nor by invocation of equitable powers, nor by any other means does a court have the power to confer citizenship in violation of these limitations." *Id.*

In *Mustanich v. Mukasey*, the Ninth Circuit found *Pangilinan* controlling where the plaintiff (Jess Mustanich) sought to avoid removal on the basis "that he [was] a United States citizen, arguing that although he did not file an application for naturalization prior to the applicable statutory deadline, the United States [was] equitably estopped from denying his citizenship because the Government's own affirmative misconduct precluded a timely filing." 518 F.3d at 1085. Mustanich had been born in El Salvador and was adopted by two United States citizens, who brought him to the United States. *Id.* at 1086. Because he was born outside the

46

country, Mustanich was required to satisfy the requirements of 8 U.S.C. § 1433 before becoming a

naturalized citizen, including the requirement that he apply for naturalization prior to his

eighteenth birthday. 8 U.S.C. § 1433(a)(3).  *Id.*  Despite efforts to meet this requirement,

Mustanich's eighteenth birthday passed without an application being filed.

>     The court described the facts as follows:

> > Mustanich's father, James Mustanich (James), made several unsuccessful attempts to submit a timely application for naturalization on his son's behalf. These attempts began in 1988, when he tried to file a completed application at an INS field office in San Jose, California. An INS employee refused to accept the application because it was beyond her expertise, and told James to contact INS by telephone for assistance. James telephoned the agency a few days later. The person who answered took his contact information and explained that another INS employee would call him about the matter in the near future, but a call never came. James telephoned again approximately one month later asking for instructions on how to file the application, but the response was the same: INS took James's contact information and stated that it would call him back, but never did. Two or three months later, James called again and received the same treatment. Neither James nor Mustanich was represented by an immigration lawyer during this process.

> > In approximately 1990, Mustanich became a ward of the Superior Court of California, Juvenile Division, due to unspecified criminal conduct. Between 1991 and 1994, James made five separate requests for the court to look into the issue of Mustanich's citizenship because the naturalization application still had not been filed. The court ordered Mustanich's social worker to provide assistance, but the social worker apparently took no action. James also raised the citizenship issue with Mustanich's probation officer sometime between 1994 and 1996, but the probation officer did not furnish any helpful information.

*Id.*  Mustanich was subsequently placed into removal proceedings after being convicted of first-

degree burglary.  *Id.* at 1086.

>     The court found that the equitable relief Mustanich requested was unavailable under

*Pangilinan*:

> > Although we sincerely lament that Mustanich and his family were not better served by the representatives of the United States from whom they repeatedly sought assistance, we are bound by the law as declared by the Supreme Court, and must reject his argument.

> > The Constitution confers upon Congress exclusive authority to establish rules of naturalization.  U.S. Const. art. I, § 8, cl. 4; *INS v. Pangilinan*, 486 U.S. 875, 882, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988). The corollary to this allocation of authority is that "the power

47

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> to make someone a citizen of the United States has not been conferred upon the federal courts, like mandamus or injunction, as one of their generally applicable equitable powers. " *Id.* at 883–84, 108 S.Ct. 2210. "Rather, it has been given them as a specific function to be performed in strict compliance with the terms" set forth by Congress. *Id.* at 884, 108 S.Ct. 2210. "Neither by application of the doctrine of estoppel, nor by invocation of equitable powers, nor by any other means does a court have the power to confer citizenship in violation of these limitations." *Id.* at 885, 108 S.Ct. 2210.
>
> Bound by *Pangilinan*, we hold that the Government is not estopped from denying Mustanich citizenship. Congress plainly requires that an individual born abroad apply for naturalization prior to his or her eighteenth birthday. 8 U.S.C. § 1433(a)(3). That requirement cannot be ignored.   See 8 U.S.C. § 1421(d) ("A person may only be naturalized as a citizen of the United States in the manner and under the conditions prescribed in this subchapter and not otherwise."). Mustanich concedes that he did not file his application on time. Estoppel in these circumstances would amount to precisely the type of equity-based departure from the requirements of the immigration statutes that Pangilinan prohibits.  See 486 U.S. at 885, 108 S.Ct. 2210.

*Id.* at 1087–88.

### b.  *Salgado-Diaz* and *Torres*

Plaintiff relies heavily on the *Salgado-Diaz* case in support of his contention that equitable estoppel may offer a remedy in this case and that he should be permitted to pursue discovery so that he can establish that an equitable remedy is appropriate.  In that case, the plaintiff (Salgado-Diaz) had a pending deportation case when U.S. Border Patrol agents allegedly approached him on the street in the United States because he appeared to be Hispanic and questioned him about his immigration status. 395 F.3d at 1160.   Salgado-Diaz alleged that he told the agents that he had a pending hearing in his immigration case but they coerced him into signing a voluntary departure form (which he did not understand was a voluntary departure form) and sent him by bus to Tecate, Mexico. *Id.* Six days after he was taken to Mexico, Salgado-Diaz attempted to re-enter the United States in order to attend his immigration hearing but was arrested for using a fake passport, whereupon the INS sought to terminate the deportation proceedings in order to initiate exclusion proceedings against Salgado-Diaz in which more serious charges would be brought against him and more stringent standards would apply. *Id.*

Salgado-Diaz opposed the termination of his deportation proceeding, arguing "that he did not voluntarily depart the United States but instead was coerced into leaving the country." *Id.*  The

48

1    INS, in turn, requested "an evidentiary hearing, which it believed necessary for the IJ 'to correctly

2    rule on the issue of termination.' " *Id.* at 1160-1161.  However, the IJ terminated the deportation

3    proceeding without conducting an evidentiary hearing on the circumstances under which Salgado-

4    Diaz left the country, concluding that that issue could be addressed in the exclusion proceeding.

5    *Id.* at 1161. "The IJ acknowledged that petitioner could be disadvantaged if the INS did not

6    initiate the exclusion proceedings before April 1, 1997, the effective date of the Illegal

7    Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub.L. No. 104–208,

8    which worked major changes in the immigration laws that would be unfavorable to someone in

9    Salgado–Diaz's circumstances." *Id.*  "But the IJ also suggested that Salgado–Diaz could seek

10   relief on appeal from any prejudice caused by terminating the old proceedings if the new

11   proceedings did not begin until after April 1, 1997." *Id.*

12        Salgado-Diaz appealed to the Board of Immigration Appeals ("BIA"), asserting that the IJ

13   violated his due process rights by terminating his deportation proceedings without a full and fair

14   hearing on his claim that he had been forcibly removed by the border agents, who knew he was

15   already in deportation proceedings. *Id.*  Salgado–Diaz also argued that the INS should be

16   estopped from relying on his illegal reentry based on its affirmative misconduct. *Id.*  The BIA

17   affirmed the IJ's decision, holding that "based on the record before it, and 'absent the testimony or

18   affidavit of the arresting officers,' it could not conclude that the agents who arrested Salgado–Diaz

19   coerced him into signing voluntary return documents or that the INS should be estopped." *Id.*

20   Salgado-Diaz appealed to the Ninth Circuit, asking the Court of Appeals to consider his argument

21   that he should be in deportation proceedings rather than exclusion proceedings. *Id.*  The INS

22   argued in response that the appeal raised a factual question that required an evidentiary hearing,

23   and further represented that "if the facts demonstrated that border agents had arrested petitioner

24   unlawfully, Salgado–Diaz could still apply for relief from deportation." *Id.*

25        The Ninth Circuit concluded in this first appeal that the IJ's decision to terminate the

26   deportation proceedings in favor of an exclusion proceeding was not a final order of deportation or

27   exclusion and therefore, that it did not have jurisdiction over the appeal. *Id.*  However, it noted in

28   its dismissal order that "the INS had represented that Salgado–Diaz 'may litigate his claims

49

1    regarding the legality of his departure, as well as litigate the question of whether he is properly in

2    exclusion or deportation, at an exclusion hearing.' " *Id.*

3          Following the first appeal, the INS initiated removal proceedings against Salgado-Diaz – a

4    new procedure established under the IIRIRA, which had recently gone into effect, that replaced

5    exclusion proceedings. *Id.* at 1162. Despite repeated requests by Salgado-Diaz for an evidentiary

6    hearing to address whether he had been forcibly and unlawfully removed from the country prior to

7    his illegal reentry, the IJ did not conduct such a hearing and eventually found that Salgado-Diaz

8    was subject to removal based on his reentry. *Id.* The BIA affirmed and a second appeal to the

9    Ninth Circuit followed. The Ninth Circuit found that the IJ's failure to hold a full and fair hearing

10   to address whether Salgado-Diaz had been illegally removed from the country by the border

11   agents violated his right to due process. Id. at 1162-1165. The court explained that, "assuming

12   petitioner had demonstrated that his 'deportation' was not voluntary or lawfully executed,

13   Salgado–Diaz would have been returned to his original, prearrest status, under conditions

14   favorable to his qualifying for relief from deportation." *Id.* at 1164.

15         The court rejected the government's argument that there was no prejudice because under

16   IIRIRA, Salgado–Diaz would not be eligible "for relief in the form of cancellation of removal, and

17   thus his 2001 removal order remain[ed] valid." The court explained,

18             Under the prior statutory regime, the Attorney General could suspend
               the deportation of an alien who could demonstrate (1) physical
19             presence in the United States for the seven-year period prior to his
               application; (2) good moral character during that period; and (3) that
20             his deportation would result in extreme hardship to himself or to his
               United States citizen or permanent resident spouse, parent or child. 8
21             U.S.C. § 1254(a)(1)(1994) (repealed by Pub.L. 104–208). By
               November 1996, Salgado–Diaz had been in the United States more
22             than seven years, had not been convicted of any crimes and had a U.S.
               citizen daughter.
23
               In short, Salgado–Diaz had a fair shot at suspension of deportation
24             but no chance at all once his hearing process recommenced after April
               1997 under the new, stricter IIRIRA regime. Thus, Salgado–Diaz has
25             established prejudice stemming from the failure of the IJ to hold an
               evidentiary hearing on allegations that the INS acted improperly in
26             stopping and removing him when he was already in immigration
               proceedings.
27

28   *Id.* at 1164-65.

United States District Court
Northern District of California

The court went on to address Salgado-Diaz's argument that the government should be equitably estopped from relying on his illegal reentry to remove him because of the illegal expulsion by the border patrol agents. *Id.* at 1165-1167. The INS argued that "Salgado–Diaz's attempt to enter the United States as a nonresident without any legal status and only fake documentation provide[d] an independent and adequate basis for ordering him removable, regardless of whether he [could] establish a Fourth Amendment violation or that he was forced to leave the country during his immigration proceeding." *Id.* at 1165. It further asserted that Salgado-Diaz's "decision to seek admission to the United States without a valid visa was of his own volition and in violation of the immigrations laws." *Id.* But the Ninth Circuit rejected that argument, calling it a "bootstrap argument" and stating:

> Salgado–Diaz was placed in the position of seeking to re-enter the United States because of the allegedly unconstitutional stop and improper removal by border agents. Although he may have not had "legal status" at the time of his arrest and expulsion, petitioner was in the midst of a proceeding to determine his status. We conclude that the doctrine of equitable estoppel precludes the INS from relying on the consequences of its own alleged affirmative misconduct to insulate that misconduct from review.

*Id.* The court further held, "if [Salgado-Diaz] can in the evidentiary hearing to which we hold he is entitled, prove that the INS deprived him of his right to have his immigration status determined in the pending deportation proceeding, the government cannot rely on the post-expulsion events its own misconduct set in motion." *Id.* It also noted that the equities favored Salgado-Diaz because of "the INS's representations to this court and petitioner that he would have the opportunity to litigate his claims at an evidentiary hearing and, if successful, seek suspension of deportation relief." *Id.*

Turning to the four traditional elements of estoppel, the court found that they were satisfied. *Id.* at 1166. First, the court found that the parties to be estopped knew the facts because: 1) the agents who expelled Salgado-Diaz knew that Salgado-Diaz was already in a pending deportation proceeding and had an upcoming hearing; 2) the border agents should have known that they were violating his Fourth Amendment rights by stopping him based on his Hispanic appearance; and 3) the INS "knowing [Salgado-Diaz's] claims about his San Diego arrest and

1    expulsion and the circumstances of his reentry, further told this court on the first appeal—nearly

2    three years after having instituted removal proceedings—that petitioner would have the

3    opportunity 'to litigate his claims regarding the legality of his departure.' " *Id.* at 1166-67 (citing

4    *Gonzalez-Rivera v. I.N.S.*, 22 F.3d 1441, 1450 (9th Cir. 1994) ("The fact that INS officers receive

5    extensive training in Fourth Amendment law . . . also supports the inference that when an INS

6    officer makes a stop based solely on race, he or she has *deliberately violated the law or has acted*

7    *in conscious disregard* of the Constitution.") (emphasis added in *Salgado-Diaz*)).

8            Second, "assuming petitioner's claims to be true, the border agents intended the

9    consequences of their actions—they physically removed Salgado–Diaz from San Diego to

10   Mexico, essentially deporting him without a proceeding. For its part, the INS plainly intended that

11   this court and petitioner would act in accordance with the representations it made that Salgado–

12   Diaz would receive a hearing." *Id.*

13          "Third, Salgado–Diaz did not understand the basis for the border patrol agents stopping or

14   arresting him. He also alleges he did not understand the significance of the documents he was

15   induced to sign, namely that they would lead to his deportation rather than the INS tracking down

16   his pending immigration hearing status." *Id.*

17          Finally, the court found that Salgado-Diaz was "severely disadvantaged" by the conduct of

18   the border agents, reasoning:

19              The act of taking him out of the country had the effect of changing
                his immigration status. *See Heckler v. Cmty. Health Serv.*, 467 U.S.
20              51, 61, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984) (analyzing detrimental
                reliance by examining "the manner in which reliance on the
21              government's misconduct has caused the private citizen to change his
                position for the worse"). Had he not attempted to return to the United
22              States so he could appear at his pending immigration hearing, he may
                have lost his chance to assert his eligibility for relief from deportation.
23              Further, petitioner detrimentally relied on assertions by the INS that
                he should and would receive a hearing on his claims. Our own
24              disposition in the first appeal expressly relied on those assertions.

25   *Id.*

26          For these reasons, the Court of Appeals found that "*if* [Salgado-Diaz] prove[d] the alleged

27   affirmative misconduct—the equities strongly weigh[ed] in favor of estopping the government

28   from seeking removal based on [his] reentry." *Id.* (emphasis in original). It remanded the case to

the BIA with instructions that an evidentiary hearing should be held by an immigration judge to

determine the facts relating to Salgado–Diaz's arrest and expulsion by border patrol agents. *Id.*

The Court further ordered as follows:

> If he establishes that his arrest was unconstitutional, evidence stemming from the arrest, including his voluntary departure and I–213 forms should be suppressed. If Salgado–Diaz demonstrates that he was involuntarily removed from the country during his pending deportation proceedings, then he will have shown that he should never have been placed in exclusion proceedings. In either eventuality, Salgado–Diaz will be entitled to the relief available at the time of his original hearing, including suspension of deportation under former 8 U.S.C. § 1254(a)(1), as if the arrest and expulsion had not occurred. . . . . Finally, if petitioner establishes in the evidentiary hearing that the border agents engaged in the alleged affirmative misconduct, the government will be estopped from relying on his attempted reentry to render him removable.

*Id.* at 1167-68.

Plaintiff also relies on *Torres v. Meissner*, 229 F.3d 1159 (9th Cir. 2000) in support of his

assertion that equitable relief is available in this case. *Torres* is an unpublished decision in which

the plaintiff had filed a petition for adjustment of status, for which he qualified derivatively of his

mother as a dependent child. 2000 WL 831809, at *1. "As he would no longer qualify as a

dependent child when he turned twenty-one on January 31, 1997, the Torreses repeatedly asked

the INS to expedite the processing of their applications." *Id.* Nevertheless, INS requested a

fingerprint check from the FBI without requesting that the processing be expedited "and on

February 12 it received a transmission from the FBI showing that Torres had no criminal record."

*Id.* "The INS then denied Torres's application because he had 'aged out' twelve days earlier." *Id.*

The court found that INS had acted arbitrarily and capriciously under the APA, 5 U.S.C. §

706(2)(A), in failing to request expedited treatment of Torres's fingerprint check by the FBI

because INS's own internal guidelines provided that "requests to the FBI to expedite are to be

made for family groups containing a dependent child who is about to 'age out' " and that

"[e]very effort should be made . . . to complete processing for the entire family prior to the

dependent turning 21 years of age." *Id.* It further concluded that had a request to expedite been

made, the fingerprints would likely have been processed before Meissner turned 21. *Id.* at *2.

Therefore, the Ninth Circuit reversed the judgment of the district court and remanded "with

United States District Court
Northern District of California

1   instructions that the INS be ordered to grant Michael Torres's application for adjustment of status

2   to lawful permanent residence *nunc pro tunc*." *Id.*

3       **2. Discussion**

4       Plaintiff "seeks either an order to print the visas already issued, or alternatively an order

5   that any further consideration of the Remaining Beneficiaries' applications be *nunc pro tunc* to

6   their July 2017 interview."   As discussed above, Plaintiff's allegations are insufficient to establish

7   that the consular officer had a nondiscretionary duty to print the visas of the Remaining

8   Beneficiaries.  Therefore, the first remedy is barred under the doctrine of consular

9   nonreviewability.  The more difficult question is whether Plaintiff may be able to show that he is

10  entitled to the alternative equitable relief he seeks and thus, that his claims be permitted to go

11  forward so that he can conduct discovery.

12      As a preliminary matter, the Court rejects Defendants' argument that the relief Plaintiff

13  seeks is categorically barred under the *Hibi* and *Pangilinan* line of cases.  *Pangilinan* made clear

14  that the "fundamental" problem with exercising the court's equitable power to award citizenship is

15  that "the power to make someone a citizen of the United States has not been conferred upon the

16  federal courts, like mandamus or injunction, as one of their generally applicable equitable

17  powers."   486 U.S. at 883-884 (citing 28 U.S.C. § 1361; 28 U.S.C. § 1651).  The Court in

18  *Pangilinan* did not hold broadly that courts may not afford equitable relief that would require the

19  government to consider eligibility for a visa (as opposed to conferring citizenship) based on facts

20  as they existed at some earlier date where circumstances warrant such relief.  Therefore, the Court

21  concludes that it is not categorically barred under *Pangilinan* from ordering *nunc pro tunc*

22  consideration of the Remaining Beneficiaries' visa applications.[6]

23  _____

24  [6] The Court also notes that the Ninth Circuit has held that *Pangilinan* "only 'precludes the judiciary from exercising its statutory powers of naturalization to redress statutory violations
25  except in strict conformity with Congress' authorizing legislation,' not from utilizing 'traditional constitutional remedies to rectify constitutional violations.'" *Mustanich*,  518 F3d at 1088 (quoting
26  *Wauchope v. United States Department of State*, 985 F.2d 1407, 1418 (9th Cir.1993)).   Thus, in
27  *Salgado-Diaz*, the court ordered that if  the plaintiff could establish the alleged affirmative misconduct, the government would be required not only to disregard facts that post-dated the wrongful conduct but also to apply the more lenient statute that had been superseded by IIRIRA.
28  This exception to the *Pangilinan* rule does not apply here, however, because Plaintiff has not established that Defendants violated his constitutional rights, as discussed above.

United States District Court
Northern District of California

United States District Court
Northern District of California

1       Next, the Court must determine whether Plaintiff has alleged facts which, if proven true,

2 would be sufficient to demonstrate affirmative misconduct by the government.  Plaintiff  points to

3 the "erroneous application of the Proclamation"  and the " 'mistaken communication'  regarding

4 the visa approvals" as evidence of affirmative misconduct and further contends the "years of delay

5 following the 2017 approvals, [Defendants'] discussions with counsel, and the decision to

6 schedule the Remaining Beneficiaries for interviews in 2024 after having been aware of their

7 marital status for years, all suggest 'affirmative misconduct.' "  Plaintiff's Response at 7-8.

8       " 'A party seeking to raise estoppel against the government must establish affirmative

9 misconduct going beyond mere negligence[.]' " *Morgan v. Gonzales*, 495 F.3d 1084, 1092 (9th

10 Cir. 2007) (quoting *Watkins v. U.S. Army*, 875 F.2d 699, 707 (9th Cir. 1989) (en banc) (internal

11 quotations and alteration in original)).  "Neither the failure to inform an individual of his or her

12 legal rights nor the negligent provision of misinformation constitute affirmative misconduct."

13 *Sulit v. Schiltgen*, 213 F.3d 449, 454 (9th Cir. 2000).  On the other hand, a "deliberate lie" or a

14 "pattern of false promises" may be sufficient to meet this requirement.  *Mukherjee v. I.N.S.*, 793

15 F.2d 1006, 1009 (9th Cir. 1986).   Constitutional violations may also establish affirmative

16 misconduct; for example, in *Salgado-Diaz*, the court found that if the plaintiff's allegations were

17 true, the government engaged in affirmative misconduct when immigration officials approached

18 him, while he was in the United States, solely based on his Hispanic appearance, and then forcibly

19 removed him from the country even though an immigration proceeding was pending, thus

20 violating both his Fourth and Fifth Amendment rights. 395 F.3d at 1164.

21       Here, the Court has already concluded that Plaintiff cannot state a claim for violation of his

22 constitutional rights.  The Court further concludes that Plaintiff cannot establish affirmative

23 misconduct based on the consulate's failure to print the visas after telling the Remaining

24 Beneficiaries that their visas had been approved.  As discussed above, the approval notice given to

25 the Remaining Beneficiaries is not sufficient to establish a mandatory duty to print the visas.  Nor

26 is there any allegation or evidence that suggests that the approval notice was a "deliberate lie."

27       It is concerning that the consulate provided the Remaining Beneficiaries a written notice

28 informing them that their visas had been approved even while Defendants' internal database

1    apparently reflected the opposite, particularly as Defendants' counsel had no explanation for this

2    discrepancy.   To the extent that the approval was a "placeholder" designation pending additional

3    document submission or other administrative processes, it likely would not have been sufficient to

4    discharge the consulate's duty under 22 C.F.R. § 42.81(a), requiring that a visa be issued or

5    denied. *See Tamjidi v. Blinken*, No. 8:24-CV-00403 HDV JDE, 2024 WL 4328813, at *3 (C.D.

6    Cal. Aug. 27, 2024).   Nonetheless, the Court finds nothing in Plaintiff's allegations or the record

7    suggesting that issuance of this notice rises to the level of affirmative misconduct.

8         The Court also rejects Plaintiff's argument that Defendants engaged in affirmative

9    misconduct by revoking the Remaining Beneficiaries' visa applications based on the Proclamation

10   because it was clear from the face of the Proclamation that it did not apply to the Remaining

11   Beneficiaries' visas.  Plaintiff's theory is based on the provisions in the Proclamation stating that it

12   applies only to foreign nationals residing in the designated countries "who do not have a valid visa

13   on the applicable effective date under section 7 of this proclamation[,]"  Proclamation, Section

14   3(ii), and that "[n]o immigrant or nonimmigrant visa issued before the applicable effective date . . .

15   shall be revoked pursuant to this proclamation." *Id*.  Section 6(c).  According to Plaintiff, because

16   the consular officer told the Remaining Beneficiaries at the July 5, 2017 interview that their

17   applications had been approved, they should be considered to have had a valid visa on the

18   effective date that could not be revoked under the Proclamation.

19        Plaintiff's theory appears to be a stretch, as the regulations provide that an "immigrant visa

20   shall be evidenced by a physical visa or by an electronic visa located in the Department's records."

21   22 C.F.R. § 42.73(a).  There is no dispute that no physical visa had been provided to the

22   Remaining Beneficiaries before the effective date of the proclamation.  Nor does Plaintiff contend

23   an electronic visa existed at that time.  Even assuming, however, that Plaintiff's reading of the

24   Proclamation is correct, he points to no authority that supports the conclusion that by adopting a

25   different reading of the Proclamation, namely, that the exclusion covered only visas that had

26   actually been issued (either as a physical document or in electronic form) before the effective date

27   of the Proclamation, the government engaged in affirmative misconduct.   Defendants'

28   interpretation of the exclusion in the Proclamation is at least plausible and even if it is legally

United States District Court
Northern District of California

1    incorrect, there is nothing to suggest that their interpretation was anything more than negligent.

2        The Court also is not persuaded that under the facts of this case Plaintiff can establish

3    affirmative misconduct based on delay in issuing the visas after the July 5, 2017 approval.  The

4    Ninth Circuit has held that under some circumstances, unreasonable delay in adjudicating an

5    immigration application can constitute affirmative misconduct in the estoppel context.  *Sun Il Yoo*

6    *v. I.N.S.*, 534 F.2d 1325, 1328–29 (9th Cir. 1976); *see also Villena v. I.N.S.*, 622 F.2d 1352, 1360

7    (9th Cir. 1980).  For example, in *Sun Il Yoo*, upon which Plaintiff in this case relies, the plaintiff

8    had entered the United States on a non-immigrant student visa in 1968 and subsequently applied

9    for adjustment of status for a sixth-preference immigrant visa based on his occupation as a

10   machinist, which was an occupation that at the time of his application was listed by the Labor

11   Department as pre-certified under Schedule C of 29 C.F.R. § 60.  534 F.2d at 1326.  Had the

12   application been processed promptly, the plaintiff would have been "entitled to" the adjustment of

13   status he sought but instead the process was delayed because his application was initially denied

14   based on incorrect information provided by a former employer.  *Id.* at 1327.  Although his

15   attorney, on March 23, 1970, notified the INS of the error and supplied evidence with correct

16   information, the INS denied the application ten months later, only agreeing on March 19, 1971 to

17   reconsider the application when the plaintiff appealed it.  *Id.* at 1327, 1330 (dissent) n. 1. By that

18   time, the Plaintiff could no longer meet the requirements for the sixth-preference immigrant visa

19   and his application was denied.  *Id.* at 1327.

20       The court in *Sun Il Yoo* concluded that the one-year delay between the March 23, 1970

21   letter and the March 19, 1971 decision to reconsider was "oppressive" given that "the INS

22   acquired no new data between the time of its receipt of the [attorney letter] and its decision to

23   reconsider " and there was "no apparent justification for the Service's unreasonable delay in

24   recognizing the bona fides of [the plaintiff's] petition." *Id.*  Therefore, the court concluded that

25   the affirmative misconduct requirement was met and that estoppel was available as a remedy.

26    *Id.* at 1329.  In reaching that conclusion, the court emphasized that the INS's "duty was clear" as

27   the plaintiff "had an absolute right to a labor certification under the INS's own regulation."  *Id.*  It

28   also cited the fact that the INS had "not even attempted to offer any explanation for having

1    ignored significant, and apparently undeniable, evidence corroborating [the plaintiff's]

2    application." *Id.*

3        In contrast, in *I.N.S. v. Miranda*, the Supreme Court found that a delay of 18 months was

4    insufficient to establish affirmative misconduct.   In *Miranda*, the plaintiff was a citizen of the

5    Philippines who had married a U.S. citizen; his wife filed a visa petition with the INS on the

6    plaintiff's behalf and he, in turn, filed a visa application. *Id.* at 14-15.  The INS did not act on the

7    petition or application for 18 months, by which time the marriage had ended and the plaintiff's

8    wife had withdrawn the petition. *Id.*  The INS then initiated deportation proceedings and the

9    plaintiff argued, *inter alia*, that INS should be estopped from denying his application because of

10   its unreasonable delay. *Id.* at 16.  Although the Ninth Circuit found that the unexplained 18-month

11   delay was sufficient to establish affirmative misconduct, the Supreme Court reversed. *Id.* at 16-18.

12       The Court in *Miranda* compared the delay in *Miranda* to the circumstances in *Hibi* and in

13   *Montana v. Kennedy*, 366 U.S. 308 (1961), reasoning:

14           In *Montana*, a government official had incorrectly informed the
             petitioner's mother that she was unable to return to the United States
15           because she was pregnant. The Court found that the official's
             misstatement "falls far short of misconduct such as might prevent the
16           United States from relying on petitioner's foreign birth" as a basis for
             denying him citizenship. [366 U.S. 308, 314-315 (1961)]. In *Hibi*,
17           Congress had exempted aliens serving in the United States Armed
             Forces from certain requirements normally imposed on persons
18           seeking naturalization. We found that neither the Government's
             failure to publicize fully the rights accorded by Congress nor its
19           failure to make an authorized naturalization representative available
             to aliens serving outside of the United States estopped the
20           Government from rejecting respondent's untimely application for
             naturalization. *See* 414 U.S., at 8-9.

21

22           Unlike *Montana* and *Hibi*, where the Government's error was clear,
             the evidence that the Government failed to fulfill its duty in this case
23           is at best questionable. The only indication of negligence is the length
             of time that the INS took to process respondent's application.
24           Although the time was indeed long, we cannot say in the absence of
             evidence to the contrary that the delay was unwarranted. *Cf. Citizens*
25           *to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971)
             (presumption of regularity supports official act of public officer);
26           *United States v. Chemical Foundation*, 272 U.S. 1, 14-15 (1926)
             (same). Both the number of the applications received by the INS and
27           the need to investigate their validity may make it difficult for the
             agency to process an application as promptly as may be desirable.
28           Even if the INS arguably was negligent in not acting more
             expeditiously, its conduct was not significantly different from that in

United States District Court
Northern District of California

58

1

2

3

> *Montana* and *Hibi*. Nor is the harm to respondent different. *Montana* and *Hibi* make clear that neither the Government's conduct nor the harm to the respondent is sufficient to estop the Government from enforcing the conditions imposed by Congress for residency in this country.

4    *Id.* at 17–18.

5    This case is distinguishable from *Sun Il Yoo* because the Remaining Beneficiaries in this

6    case would not have been entitled to issuance of their visas had it not been for the delay, in

7    contrast to the Plaintiff in *Sun Il Yoon*, who had an "absolute right" to the required labor

8    certification.   Rather, the consulate retained discretion on the question of whether the Remaining

9    Beneficiaries' visa applications would be granted or denied.  Furthermore, in *Sun Il Yoon* there

10    was no indication that the government took *any* action for a year after the plaintiff's attorney

11    provided evidence correcting the record.  The record in this case, on the other hand, while not fully

12    developed, indicates that the delay that followed the July 5, 2017 interview is largely accounted

13    for.

14    First, only slightly over three months passed from the date of the visa interview and the

15    effective date of the Proclamation, October 17, 2017.  While it is unfortunate that the Remaining

16    Beneficiaries did not receive their printed visas within this window, the Court can find no

17    authority that would allow it to find that such a brief period of time, on its own, is sufficient to

18    support a finding of affirmative misconduct based on delay, even if the government took no action

19    at all during those three months.

20    Next, from the effective date of the Proclamation to the date it was rescinded, on January

21    20, 2021, the Remaining Beneficiaries presumptively did not qualify for visas, in contrast to the

22    plaintiff in *Sun Il Yoo*, who clearly *would* have qualified for the adjustment of status he requested

23    had his application been addressed more promptly.  And, as discussed above, even if Defendants'

24    interpretation of the Proclamation was incorrect, their application of the Proclamation to the

25    Remaining Beneficiaries was, at most, negligent.[7]   Furthermore, the record reflects that even

26    while the Proclamation was in effect, the consular officer, rather than doing nothing, considered

27    _____

28    [7] As previously noted, Plaintiff does not argue that the *issuance* of the Proclamation amount to affirmative misconduct and the Court does not address that question.

59

*(left margin, vertical text)* United States District Court  Northern District of California

United States District Court
Northern District of California

and denied a request for a waiver by Abdo Ali Mohamed three times between January 2018 and July 23, 2020. Second Paterson Decl. ¶ 5.

Likewise, after the Proclamation was rescinded, the consular officer promptly conducted another interview of Mr. Mohamed, on March 16, 2021, resulting in a further denial based on "fraud or misrepresentation" in the application on March 17, 2021. *Id.* And at that interview, the consular officer learned that the original petitioner had passed away, resulting in the need to obtain approval by USCIS of a substitute petitioner. *Id.* Soon after, the Court stayed the case, at Plaintiff's request, to allow Plaintiff to find a substitute petitioner and for the consulate to continue processing the visa applications of Plaintiff's beneficiaries. Dkt. no. 52 (9/24/21 Status Report). Plaintiff noted that the process of obtaining and substituting in a new petitioner had been "complicated by the ongoing civil war in Yemen and the global COVID-19 pandemic." *Id.* Furthermore, during the pendency of this case, which was filed on September 4, 2019, the Court has held periodic status conferences in which the parties reported the status of the visa applications of Plaintiff's beneficiaries. Plaintiff's counsel never informed the Court in the parties' joint reports or at the conferences that Defendants were not acting expeditiously. Nor did counsel seek relief for unjustified delay in processing the applications in this case.

In other words, rather than showing a complete failure to act on the Remaining Beneficiaries' applications during the period of delay, the record reflects that the consulate was proceeding with the processing of the visa applications of Plaintiff's beneficiaries. Indeed, many of those applications had been granted by October 2024. Dkt. no. 96-97. Under these circumstances, Plaintiff has pointed to no evidence that might be produced in discovery that would establish the delay in issuing the Remaining Beneficiaries' visas constituted affirmative misconduct, especially in light of the holding in *Miranda* that even a delay of 18 months, by itself, did not constitute affirmative misconduct, and the admonition in that case that *Hibi* and *Montana* set a high bar for establishing affirmative misconduct based on delay.

Finally, it is not sufficient to establish affirmative misconduct that the consulate in Djibouti invited the Remaining Beneficiaries to attend an interview even though Defendants knew before the interview was scheduled that the Remaining Beneficiaries were married and therefore

ineligible for child derivative visas.  *See generally* Sinodis Decl.   It is troubling that neither the consulate nor Defendants' attorneys alerted the Remaining Beneficiaries that this would prevent them from obtaining visas, allowing them to travel through a war zone, at significant expense, to attend the interview even though the ultimate grounds for denying the Remaining Beneficiaries' applications were known to Defendants, and presumably the consulate, well before the interview was scheduled.  Under the Supreme Court's jurisprudence, however, this conduct is not sufficient to establish "affirmative misconduct."

Finally, in addition to Plaintiff's failure to allege facts sufficient to establish affirmative misconduct, the Court concludes that Plaintiff cannot establish that Defendants knew facts of which Plaintiff was ignorant and engaged in conduct upon which Plaintiff and the Remaining Beneficiaries relied and which Defendants *intended* they rely upon.  In particular, the Court finds nothing in the record to suggest that Defendants affirmatively misled the Remaining Beneficiaries on the question of whether their marriages would prevent them from being issued visas.  Rather, it appears that Plaintiff (or at least, his counsel) was aware that married children were not eligible for child derivative visas at least by 2015.  *See* dkt. no. 49-2 (Second Paterson Decl.) ¶ 5 (stating that in his 2015 application, Mohamed Ali Abdo Mohamed applied for visas for himself, his spouse and five of his children but did not apply for a visa for one of his daughters because "she was married and no longer eligible as a child derivative");  Sinodis Decl., Ex. A (email exchange between counsel in which Defendants' counsel asked if any of the applicants had married and Plaintiff's counsel responded, "I do understand that some have married and no longer plan to immigrate, which I believe DOS was told at Mr. Mohamed's March 2021 interview.").  Nonetheless, there is no indication that Plaintiff's counsel inquired before the August 2024 interview whether the Remaining Beneficiaries' marriages would be taken into consideration by the consulate or that Defendants' counsel made any representations on that score.

Moreover, while Plaintiff suggests he was led to believe the Remaining Beneficiaries' marriages would not be considered because all of the other beneficiaries in this case had been granted visas following re-interview, there is no evidence or allegation that any child derivative beneficiaries in this case were married at the time their visas were issued. Nor does Plaintiff allege

that Defendants advised him or the Remaining Beneficiaries *before* they married that their marriages would not result in denial of their visa applications.

For these reasons, the Court concludes that it is unable to afford the equitable relief sought by Plaintiff and the Remaining Beneficiaries under the specific facts of this case and therefore, that his Mandamus Act and APA claims are moot. The Court does not reach the questions of whether the government's conduct caused a "serious injustice" or the public's interest would suffer if the Court were to award equitable relief.

## IV.   CONCLUSION

Like other courts faced with similarly harsh results in the immigration context, this Court finds that it is "bound by the law as declared by the Supreme Court" and can only "lament" its inability to afford a remedy to the Remaining Beneficiaries. *Mustanich*, 518 F.3d 1084, 1087 (9th Cir. 2008). For the reasons stated above, the Court GRANTS Defendants' Motion and dismisses this case, in its entirety, with prejudice. The Clerk is instructed to enter judgment in favor of Defendants and close the case.

**IT IS SO ORDERED.**

Dated: August 29, 2025

_____
JOSEPH C. SPERO
United States Magistrate Judge

United States District Court
Northern District of California

62